Filed 5/6/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CITY OF RIVERSIDE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S198638 |
| v. | ) | |
| | ) | Ct.App. 4/2 E052400 |
| INLAND EMPIRE PATIENTS HEALTH | ) | |
| AND WELLNESS CENTER, INC., et al., | ) | |
| | ) | Riverside County |
| Defendants and Appellants. | ) | Super. Ct. No. RIC10009872 |
| _____ | ) | |

The issue in this case is whether California's medical marijuana statutes preempt a local ban on facilities that distribute medical marijuana. We conclude they do not.

Both federal and California laws generally prohibit the use, possession, cultivation, transportation, and furnishing of marijuana. However, California statutes, the Compassionate Use Act of 1996 (CUA; Health & Saf. Code, § 11362.5,[1] added by initiative, Prop. 15, as approved by voters, Gen. Elec. (Nov. 5, 1996)) and the more recent Medical Marijuana Program (MMP; § 11362.7 et seq., added by Stats. 2003, ch. 875, § 2, pp. 6422, 6424), have removed certain state law obstacles from the ability of qualified patients to obtain and use marijuana for legitimate medical purposes. Among other things, these statutes exempt the "collective[ ] or cooperative[ ] cultiva[tion]" of medical

---

[1] All unlabeled statutory references are to the Health and Safety Code.

1

marijuana by qualified patients and their designated caregivers from prosecution or abatement under specified state criminal and nuisance laws that would otherwise prohibit those activities.   (§ 11362.775.)

The California Constitution recognizes the authority of cities and counties to make and enforce, within their borders, "all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.)  This inherent local police power includes broad authority to determine, for purposes of the public health, safety, and welfare, the appropriate uses of land within a local jurisdiction's borders, and preemption by state law is not lightly presumed.

In the exercise of its inherent land use power, the City of Riverside (City) has declared, by zoning ordinances, that a "[m]edical marijuana dispensary" — "[a] facility where marijuana is made available for medical purposes in accordance with" the CUA (Riverside Municipal Code (RMC), § 19.910.140)[2] — is a prohibited use of land within the city and may be abated as a public nuisance. (RMC, §§ 1.01.110E, 6.15.020Q, 19.150.020 & table 19.150.020 A.)  The City's ordinance also bans, and declares a nuisance, any use that is prohibited by federal or state law.  (RMC, §§ 1.01.110E, 6.15.020Q, 9.150.020.)

Invoking these provisions, the City brought a nuisance action against a facility operated by defendants.  The trial court issued a preliminary injunction against the distribution of marijuana from the facility.  The Court of Appeal affirmed the injunctive order.  Challenging the injunction, defendants urge, as they did below, that the City's total ban on facilities that cultivate and distribute medical marijuana in compliance with the CUA and the MMP is invalid.

---

[2]     The RMC can be examined at <http://www.riversideca.gov/municode> (as of May 6, 2013).

Defendants insist the local ban is in conflict with, and thus preempted by, those state statutes.

As we will explain, we disagree. We have consistently maintained that the CUA and the MMP are but incremental steps toward freer access to medical marijuana, and the scope of these statutes is limited and circumscribed. They merely declare that the conduct they describe cannot lead to arrest or conviction, or be abated as a nuisance, as violations of enumerated provisions of the Health and Safety Code. Nothing in the CUA or the MMP expressly or impliedly limits the inherent authority of a local jurisdiction, by its own ordinances, to regulate the use of its land, including the authority to provide that facilities for the distribution of medical marijuana will not be permitted to operate within its borders. We must therefore reject defendants' preemption argument, and must affirm the judgment of the Court of Appeal.

## LEGAL AND FACTUAL BACKGROUND

### A. Medical marijuana laws.

The federal Controlled Substances Act (CSA; 21 U.S.C. § 801 et seq.) prohibits, except for certain research purposes, the possession, distribution, and manufacture of marijuana. (*Id.*, §§ 812(c) (Schedule I, par. (c)(10)), 841(a), 844(a).) The CSA finds that marijuana is a drug with "no currently accepted medical use in treatment in the United States" (*id.*, § 812(b)(1)(B)), and there is no medical necessity exception to prosecution and conviction under the federal act (*United States v. Oakland Cannabis Buyers' Cooperative* (2001) 532 U.S. 483, 490).

California statutes similarly specify that, except as authorized by law, the possession (§ 11357), cultivation, harvesting, or processing (§ 11358), possession for sale (§ 11359), and transportation, administration, or furnishing (§ 11360) of marijuana are state criminal violations. State law further punishes one who

3

maintains a place for the purpose of unlawfully selling, using, or furnishing, or who knowingly makes available a place for storing, manufacturing, or distributing, certain controlled substances. (§§ 11366, 11366.5.) The so-called "drug den" abatement law additionally provides that every place used to unlawfully sell, serve, store, keep, manufacture, or give away certain controlled substances is a nuisance that shall be enjoined, abated, and prevented, and for which damages may be recovered. (§ 11570.) In each instance, the controlled substances in question include marijuana. (See §§ 11007, 11054, subd. (d)(13).)

However, California's voters and legislators have adopted limited exceptions to the sanctions of this state's criminal and nuisance laws in cases where marijuana is possessed, cultivated, distributed, and transported for medical purposes. In 1996, the electorate enacted the CUA. This initiative statute provides that the state law proscriptions against possession and cultivation of marijuana (§§ 11357, 11358) shall not apply to a patient, or the patient's designated primary caregiver, who possesses or cultivates marijuana for the patient's personal medical purposes upon the written or oral recommendation or approval of a physician. (§ 11362.5, subd. (d).)

In 2004, the Legislature adopted the MMP. One purpose of this statute was to "[e]nhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects." (Stats. 2003, ch. 875, § 1, subd. (b)(3), pp. 6422, 6423.) Accordingly, the MMP provides, among other things, that "[q]ualified patients . . . and the designated primary caregivers of qualified patients . . ., who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact be subject to state criminal sanctions under [s]ection 11357 [possession], 11358 [cultivation, harvesting, and processing], 11359 [possession for sale], 11360 [transportation, sale, furnishing, or administration],

4

11366 [maintenance of place for purpose of unlawful sale, use, or furnishing], 11366.5 [making place available for purpose of unlawful manufacture, storage, or distribution], or 11570 [place used for unlawful sale, serving, storage, manufacture, or furnishing as statutory nuisance]." (§ 11362.775.)

The CUA and the MMP have no effect on the federal enforceability of the CSA in California. The CSA's prohibitions on the possession, distribution, or manufacture of marijuana remain fully enforceable in this jurisdiction. (*Gonzalez v. Raich* (2005) 545 U.S. 1.)

### B. Riverside's ordinances.

As noted above, the Riverside ordinances at issue declare as a "prohibited use" within any city zoning classification (1) a "[m]edical marijuana dispensary" — defined as "[a] facility where marijuana is made available in accordance with" the CUA — and (2) any use prohibited by state or federal law. (RMC, §§ 19.150.020 & table 19.150.020 A, 19.910.140.) The RMC further provides that any condition caused or permitted to exist in violation of the ordinance is a public nuisance which may be abated by the city. (*Id.*, §§ 1.01.110E, 6.15.020Q.)

### C. The instant litigation.

Since 2009, defendant Inland Empire Patients Health and Wellness Center, Inc. (Inland Empire), has operated a medical marijuana distribution facility in Riverside. Defendants Meneleo Carlos and Filomena Carlos (the Carloses) are the owners and lessors of the Riverside property on which Inland Empire's facility is located. Their mortgage on the property is financed by defendant East West Bancorp, Inc. (Bancorp). Defendant Lanny Swerdlow is the lessee of the property, and defendant Angel City West, Inc. (Angel), provides the property with management services. Swerdlow is also a registered nurse and the manager of an immediately adjacent medical clinic doing business as THCF Health and Wellness Center (THCF). Though THCF has no direct legal link to Inland Empire, the two

5

facilities are closely associated, and THCF provides referrals to Inland Empire upon patient request.  Defendant William Joseph Sump II is a board member of Inland Empire and the general manager of Inland Empire's Riverside facility.

In January 2009, the planning division of Riverside's Community Development Department notified Swerdlow by letter that the definition of "medical marijuana dispensary" in Riverside's zoning ordinances "is an all-encompassing definition, referring to all three types of medical marijuana facilities, a dispensary, a collective and a cooperative," and that, as a consequence, "all three facilities are banned in the City of Riverside."  In May 2010, the City filed a complaint against the Carloses, Bancorp, Swerdlow, Angel, THCF, Sump, and various Doe defendants for injunctive relief to abate a public nuisance.  Inland Empire was later substituted by name for one of the Doe defendants.  The complaint alleged that defendants were operating a "medical marijuana distribution facility" in violation of the zoning provisions of the RMC.[3]

Thereafter, the City moved for a preliminary injunction against operation of Inland Empire's facility.[4]  After a hearing, the trial court granted the preliminary

---

[3]    The complaint asserted that defendants' facility was being operated within the city's business and manufacturing park zone, and that a "medical marijuana distribution facility" was a prohibited use within that zone.  But the RMC in fact makes a "[m]edical marijuana dispensary" — the broadly defined phrase used in the ordinance — a prohibited use in *every* zone within the city (see RMC provisions cited above), and Riverside has never denied that such a facility is banned everywhere within the city.

[4]    In its briefs, Inland Empire describes itself as "a not for profit California Mutual Benefit Corporation established for the sole purpose of forming an association of qualified individuals who collectively cultivate medical marijuana and redistribute [it] to each other."  No party disputes this description.  Moreover, all parties further appear to assume that Inland Empire distributed medical marijuana from an established business address.  But the record contains few details about Inland Empire's actual operations.  The only real clues appear in

*(Footnote continued on next page.)*

6

injunction, prohibiting the defendants and all persons associated with them, during the pendency of the action, from using, or allowing use of, the subject property to conduct "any activities or operations related to the distribution of marijuana."

The trial court found the case was controlled by *City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153 (*Kruse*), which held that cities may abate, as nuisances, uses in violation of their zoning and licensing regulations, and that

---

*(Footnote continued from previous page.)*

declarations supporting and in opposition to the motion for preliminary injunction. In support of the motion, Riverside Police Officer Darren Woolley declared as follows: He visited the THCF clinic at 647 North Main Street, suite 1B, in Riverside, where he received a medical marijuana authorization. Thereafter, THCF's receptionist provided him with a list of "collective storefronts" in Riverside County. Inland Empire headed the list, and its address was stated as 647 North Main Street, suite 2A, in Riverside. Woolley asked if he was already at that address. The receptionist directed him to a location "right across the lot" and said he could "purchase [his] medicine" there. Woolley walked to suite 2A, presented his authorization, passed through security, and was directed to a room "with a large counter displaying marijuana food and drink products." He was introduced to a "runner" who said she would keep track of his selections and take them to the checkout area where he would pay for and receive his purchases. He was then "led to the rear of the [facility] that was separated into small stalls. Each of these stalls was manned by a different seller of marijuana products." Woolley purchased $40 worth of marijuana from one seller and $25 worth of hashish from another. He also bought an $8 marijuana brownie. On another occasion, he attended the "Farmer's Market" at Inland Empire, when "individual growers sell their product." On this latter day, Woolley purchased marijuana from two separate vendors.

In opposition to the motion, defendant Swerdlow insisted that THCF and Inland Empire were not connected. However, Swerdlow's declaration did not dispute Inland Empire's basic method of operation, as observed by Woolley. Indeed, Swerdlow stated that Inland Empire chose its location, coincidentally adjacent to THCF, "because of its low cost, large size, central location with plenty of parking and [because] it was located in an Industrial Warehouse zone and was not near any schools, churches, etc. . . ."

7

neither the CUA nor the MMP preempts local zoning and licensing regulation of facilities that furnish, distribute, or make available medical marijuana — including, in *Kruse* itself, a moratorium on all such facilities within city boundaries. Moreover, though the court insisted it was not holding that federal prohibitions on the possession, distribution, or cultivation of marijuana preempted state medical marijuana laws, it nonetheless concluded that Riverside "[could] use its . . . zoning regulations to prohibit the activity [of dispensing medical marijuana] especially given the conflict between state and federal laws."

The Court of Appeal affirmed the order. The appellate court agreed with defendants that the City could not assert *federal* preemption of *state* law as authority for its total ban on medical marijuana dispensing facilities. However, the court rejected defendants' argument that Riverside's zoning prohibition of such facilities was preempted by state law, the CUA and the MMP. In the Court of Appeal's view, Riverside's provisions do not duplicate or contradict the state statutes concerning medical marijuana, nor do they invade a field expressly or impliedly occupied by those laws.

We granted review. We now conclude the Court of Appeal's judgment must be affirmed.

8

**DISCUSSION[5]**

**A. Principles of preemption.**

As indicated above, "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) "Land use regulation in California historically has been a function of local government under the grant of police power contained in article XI, section 7. . . . 'We have recognized that a city's or county's power to control its own land use decisions derives from this inherent police power, not from the delegation of authority by the state.' " (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1151 (*Big Creek Lumber Co.*), fn. omitted.) Consistent with this principle, "when local government regulates in an area over which it traditionally has exercised control, such as the location of particular land uses, California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is *not* preempted by state statute." (*Id.*, at p. 1149; see *IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 93.)

However, local legislation that conflicts with state law is void. (E.g., *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 (*Sherwin-Williams Co.*).) " 'A conflict exists if the local legislation " 'duplicates,

_____

**5** An amicus curiae brief on behalf of defendants has been submitted by Americans For Safe Access. Amicus curiae briefs on behalf of the City have been submitted by (1) the League of California Cities and the California State Association of Counties (League of California Cities et al.), (2) the California State Sheriffs' Association, the California Police Chiefs Association, and the California Peace Officers' Association (California State Sheriffs' Association et al.), and (3) the City of Los Angeles.

contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.' " ' [Citations.]" (*Ibid.*)

"Local legislation is 'duplicative' of general law when it is coextensive therewith. [Citation.]

"Similarly, local legislation is 'contradictory' to general law when it is inimical thereto. [Citation.]

"Finally, local legislation enters an area that is 'fully occupied' by general law when the Legislature has expressly manifested its intent to 'fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality. [Citations.]" (*Sherwin-Williams Co.*, *supra*, 4 Cal.4th 893, 897-898; see *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 860-861 (*Great Western Shows*); *California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 188.)

The "contradictory and inimical" form of preemption does not apply unless the ordinance directly requires what the state statute forbids or prohibits what the state enactment demands. (*Big Creek Lumber*, *supra*, 38 Cal.4th 1139, 1161; *Great Western Shows*, *supra*, 27 Cal.4th 853, 866; *Sherwin-Williams Co.*, *supra*, 4 Cal.4th 893, 902.) Thus, no inimical conflict will be found where it is reasonably possible to comply with both the state and local laws.

In addition, "[w]e have been particularly 'reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another.' " (*Big Creek Lumber Co.*, *supra*, 38 Cal.4th 1139, 1149, quoting *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 707.) " 'The common thread of the cases is that if there is a significant local interest to be served which may differ from one locality to another then the presumption favors the validity of the local ordinance against an attack of state preemption.' " (*Big Creek Lumber Co.*, *supra*, at p. 1149, quoting *Gluck v. City of Los Angeles* (1979) 93 Cal.App.3d 121, 133.)

### B.  The CUA and the MMP do not preempt Riverside's ban.

When they adopted the CUA in 1996, the voters declared their intent "[t]o ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes" upon a physician's recommendation (§ 11362.5, subd. (b)(1)(A)), "[t]o ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction" (*id.*, subd. (b)(1)(B)), and "[t]o encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need" of the substance (*id.*, subd. (b)(1)(C)).

But the operative steps the electorate took toward these goals were modest. In its substantive provisions, the CUA simply declares that (1) no physician may be punished or denied any right or privilege under state law for recommending medical marijuana to a patient (§ 11362.5, subd. (c)), and (2) two specific state statutes prohibiting the possession and cultivation of marijuana, sections 11357 and 11358 respectively, "shall not apply" to a patient, or the patient's designated primary caregiver, who possesses or cultivates marijuana for the patient's personal

11

medical use upon a physician's recommendation or approval (§ 11362.5, subd. (d)).

When it later adopted the MMP, the Legislature declared this statute was intended, among other things, to "[c]larify the scope of the application of the [CUA] and facilitate the prompt identification of qualified [medical marijuana] patients and their designated primary caregivers" in order to protect them from unnecessary arrest and prosecution for marijuana offenses, to "[p]romote uniform and consistent application of the [CUA] among the counties within the state," and to "[e]nhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects" (Stats. 2003, ch. 875, § 1, subd. (b), pp. 6422, 6423).

Again, however, the steps the MMP took in pursuit of these objectives were limited and specific. The MMP established a program for issuance of medical marijuana identification cards to those qualified patients and designated primary caregivers who wish to carry them, and required responsible county agencies to cooperate in this program. (§§ 11362.71, subds. (a)-(d), 11362.715, 11362.72, 11362.735, 11362.74, 11362.745, 11362.755.) It provided that the holder of an identification card shall not be subject to arrest for possession, transportation, delivery, or cultivation of medical marijuana, within the amounts specified by the statute, except upon reasonable cause to believe the card is false or invalid or the holder is in violation of statute. (§ 11362.71, subd. (e); see § 11362.77, subd. (a).)

The MMP further specified that certain persons, including (1) a qualified patient, or the holder of a valid identification card, who possesses or transports marijuana for personal medical use, or (2) a designated primary caregiver who transports, processes, administers, delivers, or gives away, in amounts no greater than those specified by statute, marijuana for medical purposes to or for a qualified patient or valid cardholder "shall not be subject, on that sole basis, to criminal

12

liability" under section 11357 (possession of marijuana), 11358 (cultivation of marijuana), 11359 (possession of marijuana for sale), 11360 (sale, transportation, importation, or furnishing of marijuana), 11366 (maintaining place for purpose of unlawfully selling, furnishing, or using controlled substance), 11366.5 (knowingly providing place for purpose of unlawfully manufacturing, storing, or distributing controlled substance), or 11570 (place used for unlawful selling, furnishing, storing, or manufacturing of controlled substance as nuisance).  (§ 11362.765, subd. (a).)

Finally, as indicated above, the MMP declared that "[q]ualified patients, persons with valid identification cards, and the designated primary caregivers of [such persons], who associate within the State of California in order collectively or cooperatively to cultivate marijuana for medical purposes, shall not *solely on the basis of that fact* be subject to *state criminal sanctions* under Section 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570."  (§ 11362.775, italics added.) However, an amendment adopted in 2010 declares that no medical marijuana "cooperative, collective, dispensary, operator, establishment, or provider," other than a licensed residential or elder medical care facility, that is "authorized by law" to possess, cultivate, or distribute medical marijuana, and that "has a storefront or mobile retail outlet which ordinarily requires a local business license," shall be located within 600 feet of a school.  (§ 11362.768, subds. (a)-(e), as added by Stats. 2010, ch. 603, § 1.)

Our decisions have stressed the narrow reach of these statutes.  Thus, in *Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920 (*Ross*), a telecommunications company discharged an employee from his supervisory position after an employer-mandated drug test disclosed the presence of tetrahydrocannabinol, a chemical found in marijuana.  The employee sued, urging that his termination for this reason violated both the state's Fair Employment and

13

Housing Act (FEHA) and public policy. The employee's complaint alleged that he ingested medical marijuana, as a qualified patient under the CUA, to alleviate his chronic back pain, but was nonetheless able to perform his duties satisfactorily. Hence, the complaint asserted, the employer was obliged, under the FEHA, to accommodate his disability by accepting his use of medical marijuana. The trial court sustained the employer's demurrer without leave to amend and dismissed the action.

The Court of Appeal affirmed, and we upheld the Court of Appeal's judgment. We noted that neither the CUA's findings and declarations, nor its substantive provisions, mention employment rights, except in their protection of physicians who recommend medical marijuana to patients.

The employee urged that such rights were implied in the voters' declaration of their intent in the CUA "[t]o ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes." (§ 11362.5, subd. (b)(1)(A).) We rejected this notion. As we observed, "[p]laintiff would read [this declaration] as if it created a broad right to use marijuana without hindrance or inconvenience, enforceable against private parties such as employers." (*Ross*, *supra*, 42 Cal.4th 920, 928.) On the contrary, we stated, "the only 'right' to obtain and use marijuana created by the [CUA] is the right of 'a patient, or . . . a patient's primary caregiver, [to] possess[] or cultivate[] marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician' without thereby becoming subject to punishment under sections 11357 and 11358 of the Health and Safety Code. [Citation.]" (*Ross*, *supra*, at p. 929.)

In reaching this conclusion, we emphasized the CUA's "modest objectives" (*Ross*, *supra*, 42 Cal.4th 920, 930), pointing out that the initiative's proponents had "consistently described the proposed measure to the voters as motivated" only "by the desire to create a narrow exception to the criminal law" for medical

14

marijuana possession and use under the circumstances specified. (*Id.*, at p. 929.) We endorsed the observation that " 'the proponents' ballot arguments reveal a delicate tightrope walk designed to induce voter approval, which we would upset were we to stretch the proposition's limited immunity to cover that which its language does not.' " (*Id.*, at p. 930, quoting *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1152.)

In *People v. Mentch* (2008) 45 Cal.4th 274 (*Mentch*), a defendant charged with cultivation and possession for sale of marijuana sought to raise the defense, among others, that he was immune from conviction as a "primary caregiver" protected by the CUA. Two witnesses testified they had medical marijuana recommendations and obtained their marijuana from the defendant, paying him in cash for their supplies. The defendant testified that he himself had a medical marijuana recommendation; had studied how to grow marijuana; had thereafter opened a "caregiving and consultancy business" to give people safe access to medical marijuana; and supplied medical marijuana to five patients. The defendant also stated that he took " 'a couple' " of patients to medical appointments "on a 'sporadic' basis," and that he provided shelter to one patient during a brief part of the time he was selling her marijuana. (*Mentch*, at p. 280.)

Finding insufficient evidence on the point, the trial court declined to provide a "primary caregiver" instruction, and the defendant was convicted as charged. The Court of Appeal reversed the convictions. The appellate court concluded that evidence the defendant grew medical marijuana for qualified patients, counseled them on how to grow and use medical marijuana, and occasionally took them to medical appointments was sufficient to warrant a "primary caregiver" instruction. (*Mentch*, *supra*, 45 Cal.4th 274, 281-282.)

We reversed the Court of Appeal. We first examined the CUA's definition of a "primary caregiver" as "the individual designated by [a qualified medical

marijuana patient] who has *consistently* assumed responsibility for the *housing, health, or safety* of that person." (§ 11362.5, subd. (e), italics added.) This language, we reasoned, "impl[ied]" an ongoing "caretaking relationship directed at the core survival needs of a seriously ill patient, not just one single pharmaceutical need." (*Mentch*, *supra*, 45 Cal.4th 274, 286.) Further, we observed, the ballot arguments for Proposition 215, which became the CUA, suggested that a patient would be primarily responsible for noncommercially supplying his or her own medical marijuana, but that a "primary caregiver" should be allowed to act for a seriously or terminally afflicted patient who was too ill or bedridden to do so. Accordingly, we held that a person cannot establish "primary caregiver" status simply by showing he or she was chosen and used by a qualified patient to assist the patient in obtaining and ingesting medical marijuana. Instead, we concluded, a "primary caregiver" must prove, at a minimum, that he or she consistently provided care in such areas as housing, health, and safety, independent of any help with medical marijuana, and undertook such general caregiving duties before assuming responsibility for assisting with medical marijuana.

Alternatively, the defendant urged that the MMP, specifically section 11362.765, provides a defense against charges of cultivation and possession for sale to those who assist patients and primary caregivers in administering, or learning how to cultivate or administer, medical marijuana. By failing to so advise his jury, the defendant insisted, the trial court breached its sua sponte duty to instruct on any affirmative defense supported by the evidence.

We responded that the defendant's reading of the MMP was too broad. We explained that while the MMP "does convey additional immunities against cultivation and possession for sale charges to specific groups of people, it does so only for specific actions; it does not provide globally that the specified groups of people may never be charged with cultivation or possession for sale. That is, the

16

immunities conveyed by section 11362.765 have three defining characteristics: (1) they each apply only to a specific group of people; (2) they each apply only to a specific range of conduct; and (3) they each apply only against a specific set of laws." (*Mentch*, *supra*, 45 Cal.4th 274, 290.)

Moreover, we noted, section 11362.765 declares only that the specified groups of people engaged in the specified conduct shall not "on that sole basis" be subject to criminal liability under the specified laws. Hence, we determined, section 11362.765, subdivision (b)(3), which grants immunity from certain state marijuana laws to one who "provides assistance to a qualified patient or . . . primary caregiver, in administering medical marijuana to the . . . patient or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the . . . patient," affords the specified criminal immunities *only* for providing the described forms of assistance. This subdivision, we said, "does not mean [the defendant] could not be charged with cultivation or possession for sale on *any* basis . . . ." (*Mentch*, *supra*, 45 Cal.4th 274, 292, original italics.) On the contrary, "to the extent he went beyond the immunized range of conduct, i.e., administration, advice, and counseling, he would, once again, subject himself to the full force of the criminal law." (*Ibid.*) Because it was undisputed that the defendant "did much more than administer, advise, and counsel," we said, the MMP afforded him no defense, and no instruction was required. (*Mentch*, at p. 292.)

Similarly, the MMP provision at issue here, section 11362.775, provides only that when particular described persons engage in particular described conduct, they enjoy, with respect to that conduct, a limited immunity *from specified state marijuana laws*. As previously noted, section 11362.775 simply declares that "[q]ualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification

17

cards, who associate . . . in order collectively or cooperatively to cultivate marijuana for medical purposes shall not *solely on the basis of that fact* be subject to *state* criminal sanctions" for the possession, furnishing, sale, cultivation, transportation, or possession for sale of marijuana, or for providing or maintaining a place for the manufacture, processing, storage, or distribution of marijuana. (Italics added; see *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 785 (*Urziceanu*).)

Recognizing the limited reach of the CUA and the MMP, Court of Appeal decisions have consistently held that these statutes, by exempting certain medical marijuana activities — including the collective cultivation and distribution of medical marijuana under specified circumstances — from the sanctions otherwise imposed by particular state antimarijuana laws, do not preempt local land use regulation of medical marijuana collectives, cooperatives, and dispensaries, even when such regulation amounts to a total ban on such facilities within a local jurisdiction's borders.

Thus, in *Kruse*, *supra*, 177 Cal.App.4th 1153, the defendant's application for a business license to operate a medical marijuana dispensary was denied by Claremont's city manager in September 2006. The grounds cited were that such a facility was not a permitted use under Claremont's land use and development code. The denial letter advised the defendant he could appeal to the city council, and could also seek an amendment to the code. He did not seek such an amendment, and he began operating his facility on the day his permit was denied. Meanwhile, he filed an administrative appeal. Therein he urged that a code amendment was unnecessary because state law (i.e., the CUA and the MMP) rendered " '[a] medical marijuana caregivers collective . . . a legal but not conforming business anywhere in the state where it is not regulated.' " (*Kruse*,

18

*supra*, at p. 1160.)  He further alleged that, before beginning operations, he had given the city notice and opportunity to adopt such regulations if it chose.

In late September 2006, while the administrative appeal was pending, the city adopted a 45-day moratorium on the issuance of any permit, variance, license, or other entitlement for operation of a medical marijuana dispensary within its boundaries.  The city manager promptly advised the defendant that adoption of the moratorium rendered his appeal moot.  Thereafter, the city extended the moratorium several times, ultimately for a period ending on September 10, 2008.

Defendant continued to operate his facility.  After he ignored two cease and desist orders, he was cited, tried, convicted, and fined for operating without a business license in violation of city ordinances.  Thereafter, he continued to operate despite the issuance of yet another cease and desist order and a succession of administrative citations.  Accordingly, in January 2007, the city sued for injunctive relief to abate a public nuisance.  The trial court issued a temporary restraining order, a preliminary injunction, and ultimately, in May 2008, a permanent injunction.  Among its other conclusions of law, the court determined that the CUA did not preempt the city's moratorium on medical marijuana dispensaries, "because 'there is nothing in the text or history of the [CUA] that suggests that the voters intended to mandate that municipalities allow [such facilities] to operate within their city limits.' "  (*Kruse*, *supra*, 177 Cal.App.4th 1153, 1162.)

On appeal, the defendant urged, inter alia, that the CUA and the MMP preempted the city's moratorium on medical marijuana dispensaries and precluded the city from denying permission to operate such a facility.  The Court of Appeal rejected this and the defendant's other claims and affirmed the judgment.

On the issue of preemption, the appellate court first found no *express* conflict between the state medical marijuana statutes and the city's action.  By

19

their terms, the Court of Appeal observed, the CUA and the MMP do no more than exempt specific groups and specific conduct from liability under particular criminal statutes.

Second, the Court of Appeal concluded, there was no *implied* preemption under either state statute. The court reasoned as follows: Neither provision addresses, much less covers, the areas of zoning, land use planning, and business licensing. The city's moratorium ordinance was not "inimical" to the state statutes, in that it did not conflict with those laws by requiring what they forbid or prohibiting what they require. Nor does the CUA or the MMP impose a comprehensive regulatory scheme "demonstrating that the availability of medical marijuana is a matter of 'statewide concern,' thereby preempting local zoning and business licensing laws." (*Kruse*, *supra*, 177 Cal.App.4th 1153, 1175.) In particular, the CUA's statement of intent " '[t]o ensure that seriously ill Californians have the right of access to obtain and use marijuana for medical purposes' " (*Kruse*, at p. 1175) does not demonstrate a matter of preemptive statewide concern, for that declaration by the voters "[did] not create 'a broad right to use marijuana without hindrance or inconvenience' [citation], or to dispense marijuana without regard to local zoning and business licensing laws" (*ibid.*). Additionally, there is no partial state coverage of medical marijuana in terms indicating clearly that a paramount state concern will not tolerate further or additional local action. Indeed, the CUA expressly states that it does not preclude legislation prohibiting conduct that endangers others, and the MMP explicitly provides that it does not prevent a local jurisdiction from adopting and enforcing laws that are consistent with its provisions.

In sum, the Court of Appeal concluded, "[n]either the CUA nor the MMP compels the establishment of local regulations to accommodate medical marijuana dispensaries. The [c]ity's enforcement of its licensing and zoning laws and its

20

temporary moratorium on medical marijuana dispensaries do not conflict with the CUA or the MMP." (*Kruse*, *supra*, 177 Cal.App.4th 1153, 1176.)

Though it did not involve a complete moratorium or ban, the Court of Appeal in *County of Los Angeles v. Hill* (2011) 192 Cal.App.4th 861 (*Hill*) similarly concluded that the CUA and the MMP do not preempt a local jurisdiction from applying its zoning and business licensing powers to regulate medical marijuana dispensaries. In particular, the *Hill* court observed, the "collective cultivation" provision of the MMP, section 11362.775, "does not confer on qualified patients and their caregivers the unfettered right to cultivate or dispense marijuana anywhere they choose." (*Hill*, *supra*, at p. 869.)

The county ordinance at issue in *Hill* placed various restrictions on the establishment and operation of medical marijuana dispensaries: it provided that such a facility could operate in a C-1 zone, but it required the operator to obtain a conditional use permit and a business license, and it prohibited the location of a dispensary within 1,000 feet of a school, playground, park, public library, place of worship, childcare facility, or youth facility.[6] County ordinances declared generally that any use of property in violation of zoning laws was a public nuisance. (*Hill*, *supra*, 192 Cal.App.4th 861, 864-865.)

The county brought a nuisance action alleging that the defendants were violating the ordinance by operating a medical marijuana dispensary in an unincorporated area of the county without obtaining a business license, a conditional use permit, and a zoning variance to allow operation within 1,000 feet

---

[6] The Court of Appeal took judicial notice that in December 2010, while the *Hill* appeal was pending, the county's board of supervisors had enacted a complete ban on medical marijuana dispensaries. (*Hill*, *supra*, 192 Cal.App.4th 861, 866, fn. 4.) The court indicated that the validity of the 2010 ordinance was not at issue, and would not be addressed, in the pending appeal. (*Ibid.*)

of a public library. The defendants did not deny they were operating next to a public library without the required authorizations. Instead, they urged that the ordinance's requirements were unconstitutional and preempted by state law. The trial court disagreed. It issued a temporary restraining order and a preliminary injunction against operation of the defendants' facility without the necessary permits. (*Hill*, *supra*, 192 Cal.App.4th 861, 865.)

The defendants appealed, and the Court of Appeal affirmed. The appellate court rejected the defendants' claims that the county's regulations were inconsistent with the MMP, and thus preempted. The defendants acknowledged that section 11362.83 as then in effect (added by Stats. 2003, ch. 875, § 2, pp. 6424, 6434; former section 11362.83) expressly authorized "a city or other local governing body [to] adopt[ ] and enforc[e] laws consistent with" the MMP. However, the defendants insisted this provision only permitted local restrictions that were " 'the same as' " those imposed by the MMP. (*Hill*, *supra*, 192 Cal.App.4th 861, 867.) The Court of Appeal disagreed, indicating that former section 11362.83 showed the Legislature "expected and intended that local governments adopt additional ordinances." (*Hill*, *supra*, at p. 868.) The defendants also conceded that section 11362.768, then recently adopted to impose a minimum 600-foot distance between a medical marijuana facility and a school (*id.*, subd. (b), added by Stats. 2010, ch. 603, § 1), explicitly permits a local jurisdiction to "adopt[ ] ordinances or policies that further restrict the location or establishment of a medical marijuana cooperative, collective, dispensary, operator, establishment, or provider" (*id.*, subd. (f)). Nonetheless, the defendants insisted, the 600-foot limit established by subdivision (b), added by Stats. 2010, ch. 603, § 1) impliedly preempted a local jurisdiction from imposing greater distance restrictions. The Court of Appeal dismissed this argument, noting the plain words of subdivision (f).

22

Finally, the Court of Appeal found no merit in the defendants' contention that because section 11362.775 affords qualified collective cultivation projects a limited immunity from nuisance prosecution under the state's "drug den" abatement law, section 11570, the county was precluded from applying its own nuisance laws to enjoin operation of a medical marijuana dispensary in violation of its zoning ordinance. Noting that the immunity provided by section 11362.775 only applies where the state-law nuisance prosecution is premised "solely on the basis" of the collective activities described in that section, the Court of Appeal concluded that the MMP "does not prevent the [c]ounty from applying its nuisance laws to [medical marijuana dispensaries] that do not comply with its valid ordinances." (*Hill*, *supra*, 192 Cal.App.4th 861, 868.)

We now agree, for the reasons expressed below, that the CUA and the MMP do not expressly or impliedly preempt Riverside's zoning provisions declaring a medical marijuana dispensary, as therein defined, to be a prohibited use, and a public nuisance, anywhere within the city limits. We set forth our conclusions in detail.

### 1. *No express preemption.*

As indicated above, the plain language of the CUA and the MMP is limited in scope. It grants specified persons and groups, when engaged in specified conduct, immunity from prosecution under specified state criminal and nuisance laws pertaining to marijuana. (*Mentch*, *supra*, 45 Cal.4th 274, 290; *Kruse*, *supra*, 177 Cal.App.4th 1153, 1175.) The CUA makes no mention of medical marijuana cooperatives, collectives, or dispensaries. It merely provides that state laws against the possession and cultivation of marijuana shall not apply to a qualified patient, or the patient's designated primary caregiver, who possesses or cultivates marijuana for the patient's personal medical use upon a physician's recommendation. (§ 11362.5, subd. (d).)

23

Though the CUA broadly states an aim to "ensure" a "right" of seriously ill persons to "obtain and use" medical marijuana as recommended by a physician (§ 11362.5, subd. (b)(1)(A)), the initiative statute's actual objectives, as presented to the voters, were "modest" (*Ross*, *supra*, 42 Cal.4th 920, 928), and its substantive provisions created no "broad right to use [medical] marijuana without hindrance or inconvenience" (*id.*, at p. 928; see *Kruse*, *supra*, 177 Cal.App.4th 1153, 1163-1164; *Urziceanu*, *supra*, 132 Cal.App.4th 747, 773 [CUA created no constitutional right to obtain medical marijuana]). There is no basis to conclude that the CUA expressly preempts local ordinances prohibiting, as a nuisance, the use of property to cooperatively or collectively cultivate and distribute medical marijuana.

The MMP, unlike the CUA, does address, among other things, the collective or cooperative cultivation and distribution of medical marijuana. But the MMP is framed in similarly narrow and modest terms. As pertinent here, it specifies only that qualified patients, identification card holders, and their designated primary caregivers are exempt from prosecution and conviction under enumerated state antimarijuana laws "solely" on the ground that such persons are engaged in the cooperative or collective cultivation, transportation, and distribution of medical marijuana among themselves. (§ 11362.775.)

The MMP's language no more creates a "broad right" of access to medical marijuana "without hindrance or inconvenience" (*Ross*, *supra*, 42 Cal.4th 920, 928) than do the words of the CUA. No provision of the MMP explicitly guarantees the availability of locations where such activities may occur, restricts the broad authority traditionally possessed by local jurisdictions to regulate zoning and land use planning within their borders, or requires local zoning and licensing laws to accommodate the cooperative or collective cultivation and distribution of

24

medical marijuana.**7**  Hence, there is no ground to conclude that Riverside's

ordinance is expressly preempted by the MMP.**8**

--------

**7**       The MMP imposes only two obligations on local governments.  It specifies the duties of a county health department or other designated county agency with respect to the establishment and implementation of the voluntary medical marijuana identification card program.  (§§ 11362.72, 11362.74.)  And it prohibits a local law enforcement agency or officer from refusing to accept an identification card as protection against *arrest* for the possession, transportation, delivery, or cultivation of specified amounts of medical marijuana, except upon "reasonable cause to believe that the information contained in the card is false or fraudulent, or the card is being used fraudulently."  (§ 11362.78; see § 11362.71, subd. (e).)

**8**       The City claims sections 11362.768, as added in 2010, and 11362.83, as amended in 2011, *expressly authorize* total local bans on medical marijuana facilities.  Section 11362.768 specifies that a "medical marijuana cooperative, collective[, or] dispensary" with "a storefront or mobile retail outlet which ordinarily requires a local business license" may not be located within 600 feet of a school (*id.*, subds. (b), (e)), but further provides that "[n]othing in this *section* shall prohibit a city [or] county . . . from adopting ordinances or policies that further restrict the location *or establishment* of" such a facility (*id.*, subd. (f), italics added; see also *id.*, subd. (g)).  Section 11362.83 now declares that nothing in the MMP shall prevent a city or other local governing body from "[a]dopting local ordinances that regulate the location, operation, *or establishment* of a medical marijuana cooperative or collective" (*id.*, subd. (a), italics added) or from "[t]he civil and criminal enforcement" of such ordinances (*id.*, subd. (b)).  The City urges that by granting local jurisdictions express authority to regulate the very "establishment" of such facilities, the MMP plainly sanctions ordinances that preclude such "establishment" within local boundaries.  Our review of the language and legislative history of these provisions does not persuade us the Legislature necessarily intended them to provide affirmative authority for total bans.  But we need not resolve the point.  Local authority to regulate land use for the public welfare is an inherent *preexisting* power, recognized by the California Constitution, and limited only to the extent exercised "in conflict with general laws."  (Cal. Const., art. XI, § 7.)  As we otherwise conclude herein, the CUA and the MMP, by their substantive terms, grant limited exemptions from certain *state* criminal and nuisance laws, but they do not expressly or impliedly *restrict* the

*(Footnote continued on next page.)*

25

### 2. *No implied preemption.*

The considerations discussed above also largely preclude any determination that the CUA or the MMP *impliedly* preempts Riverside's effort to "de-zone" facilities that dispense medical marijuana. At the outset, there is no duplication between the state laws, on the one hand, and Riverside's ordinance, on the other, in that the two schemes are coextensive. The CUA and the MMP "decriminalize," for state purposes, specified activities pertaining to medical marijuana, and also provide that the *state's* antidrug nuisance statute cannot be used to abate or enjoin these activities. On the other hand, the Riverside ordinance finds, for local purposes, that the use of property for certain of those activities *does* constitutes a *local* nuisance.

Nor do we find an "inimical" contradiction or conflict between the state and local laws, in the sense that it is impossible simultaneously to comply with both. Neither the CUA nor the MMP *requires* the cooperative or collective cultivation and distribution of medical marijuana that Riverside's ordinance deems a prohibited use of property within the city's boundaries. Conversely, Riverside's ordinance requires no conduct that is forbidden by the state statutes. Persons who refrain from operating medical marijuana facilities in Riverside are in compliance with both the local and state enactments. (Compare, e.g., *Great Western Shows*, *supra*, 27 Cal.4th 853, 866 [ordinance banning sale of firearms or ammunition on county property was not "inimical" to state statutes contemplating lawful existence

---

*(Footnote continued from previous page.)*

authority of local jurisdictions to decide whether local land may be used to operate medical marijuana facilities.

of gun shows; ordinance did not require what state law forbade or prohibit what state law demanded].)

Further, there appears no attempt by the Legislature to fully occupy the field of medical marijuana regulation as a matter of statewide concern, or to partially occupy this field under circumstances indicating that further local regulation will not be tolerated. On the contrary, as discussed in detail above, the CUA and the MMP take limited steps toward recognizing marijuana as a medicine by exempting particular medical marijuana activities from state laws that would otherwise prohibit them. In furtherance of their provisions, these statutes require local agencies to do certain things, and prohibit them from doing certain others. But the statutory terms describe no comprehensive scheme or system for authorizing, controlling, or regulating the processing and distribution of marijuana for medical purposes, such that no room remains for local action.

The presumption against preemption is additionally supported by the existence of significant local interests that may vary from jurisdiction to jurisdiction. Amici curiae League of California Cities et al. point out that "California's 482 cities and 58 counties are diverse in size, population, and use." As these amici curiae observe, while several California cities and counties allow medical marijuana facilities, it may not be reasonable to expect every community to do so.

For example, these amici curiae point out, "[s]ome communities are predominantly residential and do not have sufficient commercial or industrial space to accommodate" facilities that distribute medical marijuana. Moreover, these facilities deal in a substance which, except for legitimate medical use by a qualified patient under a physician's authorization, is illegal under both federal and state law to possess, use, furnish, or cultivate, yet is widely desired, bought, sold, cultivated, and employed as a recreational drug. Thus, facilities that dispense

27

medical marijuana may pose a danger of increased crime, congestion, blight, and drug abuse,[9] and the extent of this danger may vary widely from community to community.

Thus, while some counties and cities might consider themselves well suited to accommodating medical marijuana dispensaries, conditions in other communities might lead to the reasonable decision that such facilities within their borders, even if carefully sited, well managed, and closely monitored, would present unacceptable local risks and burdens.  (See, e.g., *Great Western Shows*, *supra*, 27 Cal.4th 853, 866-867 [noting, in support of holding that state gun show regulations did not occupy field, so as to preclude Los Angeles County's complete ban of gun shows on county property, that firearms issues likely require different treatment in urban, as opposed to rural, areas].)  Under these circumstances, we

_____

**9**      For example, when considering the 2011 amendment to section 11362.83, as proposed by Assembly Bill No. 1300 (2011-2012 Reg. Sess.), the Senate Committee on Public Safety noted the bill author's assertions about the "controversial picture of dispensaries," as revealed in "[a] scan of headlines."  As reported by the committee, the bill author recounted that some dispensaries "have been caught selling marijuana to people not authorized to possess it, many intentionally operate in the shadows without any business licensure or under falsified documentation, and some have been the scene of violent robberies and murder."  (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1300 (2011-2012 Reg. Sess.), as amended June 1, 2011, pp. E-F.)  Courts of Appeal dealing with local regulation of medical marijuana dispensaries have cited similar concerns.  (See, e.g., *Hill*, *supra*, 192 Cal.App.4th 861, 871 [because of evidence that the " 'cash only' " nature of most medical marijuana dispensary operations presents a disproportionate target for robberies and burglaries, and that such facilities affect neighborhood quality of life by attracting loitering and marijuana smoking on or near the premises, they are not similarly situated to pharmacies for public health purposes and need not be treated equally]; *Kruse*, *supra*, 177 Cal.App.4th 1153, 1161 [noting local findings of a correlation between medical marijuana dispensaries and increased crime].)

cannot lightly assume the voters or the Legislature intended to impose a "one size fits all" policy, whereby each and every one of California's diverse counties and cities must allow the use of local land for such purposes.[10]

*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061 (*O'Connell*), on which defendants rely, is readily distinguishable. There, a state law, the Uniform Controlled Substances Act (UCSA), established a comprehensive scheme for the treatment of such substances, specifying offenses and corresponding penalties in detail. Included among the sanctions provided by the UCSA was a defined program for forfeiture of particular categories of property, including vehicles, used to commit drug crimes. Under this system, vehicles were subject to forfeiture if they had been employed to facilitate the *manufacture*, *possession*, or *possession for sale* of *specified felony-level* amounts, as *explicitly* set forth, of *particular* controlled substances. Vehicle forfeiture under the UCSA required *proof beyond reasonable doubt* that the subject property had been so used. Provisions of the UCSA stated that law enforcement, not revenue, was the principal aim of forfeiture, that forfeiture had potentially harsh consequences for property owners, and that law enforcement officials should protect innocent owners' interests by providing adequate notice and due process in forfeiture proceedings.

The City of Stockton adopted an ordinance providing for *local* forfeiture of vehicles used simply to *acquire or attempt to acquire any amount of any controlled substance*, even if the offense at issue was a low-grade misdemeanor warranting only a $100 fine and no jail time, and was not eligible for forfeiture

---

[10]     Nor, under these circumstances, can we find implied preemption on grounds that a local ban on medical marijuana facilities would so impede the ability of transient citizens to obtain access to medical marijuana as to outweigh the possible benefit to the locality imposing the ban.

under the UCSA. Stockton's ordinance permitted forfeiture upon proof by a *preponderance of evidence* that the vehicle had been used for the described purpose. Forfeited vehicles were to be sold at auction, with net proceeds payable to local law enforcement and prosecutorial agencies.

Under these circumstances, the *O'Connell* majority concluded, "[t]he comprehensive nature of the UCSA in defining drug crimes and specifying penalties (including forfeiture) is so thorough and detailed as to manifest the Legislature's intent to preclude local regulation. The UCSA accordingly occupies the field of penalizing crimes involving controlled substances, thus impliedly preempting the City's forfeiture ordinance" calling for forfeiture of vehicles involved in the acquisition or attempted acquisition of drugs regulated under the UCSA. (*O'Connell*, *supra*, 41 Cal.4th 1061, 1071.) The majority explained that "the Legislature's comprehensive enactment of penalties for crimes involving controlled substances, but exclusion from that scheme of any provision for vehicle forfeiture for simple possessory drug offenses, manifests a clear intent to reserve that severe penalty for very serious drug crimes involving the manufacture, sale, or possession for sale of specified amounts of certain controlled substances." (*Id.*, at p. 1072.)

As indicated above, there is no similar evidence in this case of the Legislature's intent to preclude local regulation of facilities that dispense medical marijuana. The CUA and the MMP create no all-encompassing scheme for the control and regulation of marijuana for medicinal use. These statutes, both carefully worded, do no more than exempt certain conduct by certain persons from

certain state criminal and nuisance laws against the possession, cultivation, transportation, distribution, manufacture, and storage of marijuana.[11]

The gravamen of defendants' argument throughout is that the MMP "authorizes" the existence of facilities for the collective or cooperative cultivation and distribution of medical marijuana, and that a local ordinance prohibiting such facilities thus cannot be tolerated. But defendants' reliance on such decisions as *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277 (*Cohen*) and *City of Torrance v. Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 16 (*City of Torrance*) for this proposition is misplaced.

*Cohen*, addressing a local ordinance that closely regulated escort services, stated that "[i]f the ordinance . . . attempted to prohibit conduct proscribed or permitted by state law, either explicitly or implicitly, it would be preempted." (*Cohen*, *supra*, 40 Cal.3d 277, 293.) However, *Cohen* made clear there is no preemption where state law expressly or implicitly allows local regulation. (*Id.*, at

_____

**11** Defendants also cite *Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90, which struck down, as preempted by state law, a local ordinance banning the administration of electroconvulsive, or electric shock, therapy (ECT) within the city. The Court of Appeal found that, after expressly considering the benefits, risks, and invasive nature of ECT, a therapy recognized by the medical and psychiatric communities as useful in certain cases, the Legislature had indicated its intent that the right of every psychiatric patient to choose or refuse this therapy be " 'fully recognized and protected' " (*id.*, at p. 105), and had "enacted detailed legislation extensively regulating the administration of ECT, and requiring, among other things, stringent safeguards designated to insure that psychiatric patients have the right to refuse ECT." (*Id.*, at p. 99.) Under these circumstances, the Court of Appeal concluded that the state had occupied the field, thus precluding a locality from prohibiting the availability of ECT within its borders. By contrast, the MMP simply removes otherwise applicable state sanctions from certain medical marijuana activities, and exhibits no similar intent to occupy the field of medical marijuana regulation.

pp. 294-295.) As indicated, the MMP implicitly permits local regulation of medical marijuana facilities.

Similarly, in *City of Torrance*, *supra*, 30 Cal.3d 16, a state statute promoting the local community care of mental patients *specifically provided* that local zoning rules or use permit denials could not be used to exclude psychiatric care facilities from areas in which hospitals or nursing homes were otherwise allowed. By contrast, the MMP imposes no similar limits, express or implicit, on local zoning and permit rules.

More fundamentally, we have made clear that a state law does not "authorize" activities, to the exclusion of local bans, simply by exempting those activities from otherwise applicable state prohibitions. Thus, as discussed in *Nordyke v. King* (2002) 27 Cal.4th 875 (*Nordyke*), a state statute, Penal Code section 171b, made it a crime to possess firearms in any state or local public building, but exempted a person who, for the purpose of sale or trade, brought an otherwise lawfully possessed firearm into a gun show conducted in compliance with state law. Under an Alameda County ordinance, it was a misdemeanor to bring any firearm onto county property. The ordinance specified certain exceptions, but these did not include gun shows. Hence, a principal effect of the ordinance was to forbid the presence of firearms at gun shows on county property, thus making such shows impractical.

Gun show promoters challenged the ordinance, arguing, inter alia, that Penal Code section 171b prohibited the outlawing of guns at gun shows on public property, and thus preempted the ordinance's contrary provisions. We disagreed. As we explained, section 171b "merely exempts gun shows from the *state* criminal prohibition on possessing guns in public buildings, thereby permitting local government entities to authorize such shows. It does not *mandate* that local

32

government entities permit such a use . . . ." (*Nordyke*, *supra*, 27 Cal.4th 875, 884, first italics added.)

Similarly here, the MMP merely exempts the cooperative or collective cultivation and distribution of medical marijuana by and to qualified patients and their designated caregivers from prohibitions that would otherwise apply under state law. The state statute does not thereby *mandate* that local governments authorize, allow, or accommodate the existence of such facilities.

Defendants emphasize that among the stated purposes of the MMP, as originally enacted, are to "[p]romote uniform and consistent application of the [CUA] among the counties of the state" and to "[e]nhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects" (Stats. 2003, ch. 875, § 1, subd. (b), pp. 6422, 6423). Hence, they insist, the encouragement of medical marijuana dispensaries, under section 11362.775, is a matter of statewide concern, requiring the uniform allowance of such facilities throughout California, and leaving no room for their exclusion by individual local jurisdictions.

We disagree. As previously indicated, though the Legislature stated it intended the MMP to "promote" uniform application of the CUA and to "enhance" access to medical marijuana through collective cultivation, the MMP itself adopts but limited means of addressing these ideals. Aside from requiring local cooperation in the voluntary medical marijuana patient identification card program, the MMP's substantive provisions simply remove specified state-law sanctions from certain marijuana activities, including the cooperative or collective cultivation of medical marijuana by qualified patients and their designated caregivers. (*Mentch*, *supra*, 45 Cal.4th 274, 290.) The MMP has never expressed or implied any actual limitation on local land use or police power regulation of facilities used for the cultivation and distribution of marijuana. We cannot employ

33

the Legislature's expansive declaration of aims to stretch the MMP's effect beyond a reasonable construction of its substantive provisions.

Defendants acknowledge that the MMP expressly recognizes local authority to "regulate" medical marijuana facilities (§§ 11362.768, subds. (f), (g), 11362.83), but they rely heavily on a passage from our decision in *Great Western Shows*, *supra*, 27 Cal.4th 853, for their claim that local governments, even if granted regulatory authority, may not wholly exclude activities that are sanctioned or encouraged by state law.  On close examination, however, the premise set forth in *Great Western Shows* is not applicable here.

In *Great Western Shows*, we described several federal decisions under the federal Resource Conservation and Recovery Act (RCRA), including *Blue Circle Cement, Inc. v. Board of County Comm'rs* (10th Cir. 1994) 27 F.3d 1499 (*Blue Circle Cement*), as "stand[ing] broadly for the proposition that when a statute or statutory scheme seeks to promote a certain activity and, at the same time, permits more stringent local regulation of that activity, local regulation cannot be used to completely ban the activity or otherwise frustrate the statute's purpose."  (*Great Western Shows*, 27 Cal.4th 853, 868.)

But there are important distinctions between the RCRA and the California statutes at issue in this case.  As explained in *Blue Circle Cement*, the RCRA "is the comprehensive federal hazardous waste management statute governing the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment."  (*Blue Circle Cement*, *supra*, 27 F.3d 1499, 1505.)  The federal statute aims "to assist states and localities in the development of improved solid waste management techniques to facilitate resource recovery and conservation."  (*Ibid.*)  It "enlists the states and municipalities to participate in a 'cooperative effort' with the federal government to develop waste management practices that facilitate the recovery of 'valuable

34

materials and energy from solid waste.' " (*Id.*, at p. 1506.) Under these circumstances, the court in *Blue Circle Cement*, like other federal courts, concluded that a complete local ban on the processing, recycling, and disposal of industrial waste, imposed without consideration of specific and legitimate local health and safety concerns, would frustrate the RCRA's overarching purpose to encourage state and local cooperation in furtherance of the efficient treatment, use, and disposal of such material. (*Blue Circle Cement,* 27 F.3d 1499, 1506-1509, & cases cited.)

The MMP, by contrast, creates no comprehensive scheme for the protection or promotion of facilities that dispense medical marijuana. The sole effect of the statute's substantive terms is to exempt specified medical marijuana activities from enumerated state criminal and nuisance statutes. Those provisions do not mandate that local jurisdictions permit such activities. (See *Nordyke*, *supra*, 27 Cal.4th 875, 883-884.) Local decisions to prohibit them do not frustrate the MMP's operation. Accordingly, we are not persuaded that the premise of *Blue Circle Cement*, *supra*, 27 F.3d 1499, as paraphrased in *Great Western Shows*, *supra*, 27 Cal.4th 853, is applicable here. **12**

---

**12**      Defendants also cite *Big Creek Lumber Co.*, *supra*, 38 Cal.4th 1139, in support of their assertion that local regulation of an activity sanctioned and encouraged by state law cannot include a total ban. But this decision, too, is distinguishable. In *Big Creek Lumber Co.*, the plaintiffs argued that a county ordinance specifying the zones where timber harvesting could occur was preempted by comprehensive state forestry statutes enacted to encourage the sound and prudent exploitation of timber resources. The principal statute at issue, the Forest Practices Act (FPA), forbade counties from " 'regulat[ing] the conduct of timber operations.' " (*Big Creek Lumber Co.*, *supra*, at p. 1147.) Among other things, we found no "inimical" state-local conflict, because it was not impossible for timber operators to comply simultaneously with both the state and county enactments. We also concluded, in essence, that by limiting the locations within the county where timber harvesting was permitted, the ordinance did not

*(Footnote continued on next page.)*

Finally, defendants urge that by exempting the collective or cooperative cultivation of medical marijuana by qualified patients and their designated caregivers from treatment as a nuisance under the *state's* drug abatement laws (§ 11362.775; see § 11570 et seq.), the MMP bars local jurisdictions from adopting and enforcing ordinances that treat these very same activities as nuisances subject to abatement. But for the reasons set forth at length above, we disagree. Nuisance law is not defined exclusively by what the *state* makes subject to, or exempt from, its own nuisance statutes. Unless exercised in clear conflict with general law, a city's or county's inherent, constitutionally recognized power to determine the appropriate use of land within its borders (Cal. Const., art. XI, § 7) allows it to define nuisances for local purposes, and to seek abatement of such nuisances. (See *Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 255-256.)

---

*(Footnote continued from previous page.)*

impermissibly "regulate" the "conduct" of such operations. (*Id.*, at p. 1157.) Addressing the plaintiffs' "overriding concern" that unless preempted, counties could use locational zoning to entirely prohibit timber harvesting (*id.*, at p. 1160), we simply observed that "[t]he ordinance before us does not have that effect, nor does it appear that any county has attempted such a result." (*Id.*, at pp. 1160-1161.)

Here, as we have noted, the MMP is a limited measure, not a comprehensive scheme for the regulation and encouragement of medical marijuana facilities. As in *Big Creek Lumber Co.*, the local ordinance at issue here does not stand in "inimical" conflict with state statutes by making simultaneous compliance impossible. And unlike the FPA at issue in *Big Creek Lumber Co.*, the MMP includes provisions *recognizing* the regulatory authority of local jurisdictions. For these reasons, nothing we said in *Big Creek Lumber Co.* persuades us that Riverside's ordinance is preempted.

36

No such conflict exists here. In section 11362.775, the MMP merely removes *state law* criminal and nuisance sanctions from the conduct described therein. By this means, the MMP has signaled that the *state* declines to regard the described acts as nuisances or criminal violations, and that the *state's* enforcement mechanisms will thus not be available against these acts. Accordingly, localities in California are left free to accommodate such conduct, if they choose, free of state interference. As we have explained, however, the MMP's limited provisions neither expressly or impliedly restrict or preempt the authority of individual local jurisdictions to choose otherwise for local reasons, and to prohibit collective or cooperative medical marijuana activities within their own borders. A local jurisdiction may do so by declaring such conduct on local land to be a nuisance, and by providing means for its abatement.[13]

We thus conclude that neither the CUA nor the MMP expressly or impliedly preempts the authority of California cities and counties, under their traditional land use and police powers, to allow, restrict, limit, or entirely exclude facilities that distribute medical marijuana, and to enforce such policies by

---

[13] As defendants note, the court in *Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734 suggested that, "at first glance," it seemed "incongruous" and "odd" to conclude the CUA and the MMP, which exempt specified medical marijuana activities from *state* criminal and nuisance laws, might leave local jurisdictions free to use nuisance abatement procedures to prohibit the same activities. (*Id.*, at p. 754.) However, this issue was not presented or decided in *Qualified Patients Assn.* There the court conceded the answer "remain[ed] to be determined" and was "by no means clear cut or easily resolved on first impressions." (*Ibid.*) After careful review, and for the reasons expressed at length herein, we are not persuaded by the tentative view expressed in *Qualified Patients Assn.*

37

nuisance actions.  Accordingly, we reject defendants' challenge to Riverside's

MMD ordinances.[14]

As we have noted, the CUA and the MMP are careful and limited forays

into the subject of medical marijuana, aimed at striking a delicate balance in an

area that remains controversial, and involves sensitivity in federal-state relations.

We must take these laws as we find them, and their purposes and provisions are

modest.  They remove state-level criminal and civil sanctions from specified

medical marijuana activities, but they do not establish a comprehensive state

system of legalized medical marijuana; or grant a "right" of convenient access to

marijuana for medicinal use; or override the zoning, licensing, and police powers

of local jurisdictions; or mandate local accommodation of medical marijuana

cooperatives, collectives, or dispensaries.

Of course, nothing prevents future efforts by the Legislature, or by the

People, to adopt a different approach.  In the meantime, however, we must

conclude that Riverside's ordinances are not preempted by state law.

---

[14]    Our analysis makes it unnecessary to address the City's argument that, were
the CUA and the MMP construed to require local jurisdictions to accommodate
medical marijuana facilities, it would be preempted by the federal CSA.  Nor need
we confront the related argument of amici curiae California State Sheriffs'
Association et al. that a state law, Government Code section 37100, *forbids* a city
to adopt ordinances authorizing the use of local land for operation of medical
marijuana facilities because such ordinances would "conflict with the . . . laws of
. . . the United States," i.e., the CSA.

The judgment of the Court of Appeal is affirmed.


BAXTER, J.


WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY LIU, J.**

I join the court's opinion and write separately to clarify the proper test for state preemption of local law.

As the court says, "[L]ocal legislation that conflicts with state law is void. [Citation.] ' "A conflict exists if the local legislation ' "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." ' " [Citations.]' " (Maj. opn., *ante*, at pp. 9–10.)

The court further states: "The 'contradictory and inimical' form of preemption does not apply unless the ordinance directly requires what the state statute forbids or prohibits what the state enactment demands. [Citations.] Thus, no inimical conflict will be found where it is reasonably possible to comply with both the state and local laws." (Maj. opn., *ante*, at p. 10.)

The first sentence of the above statement should not be misunderstood to improperly limit the scope of the preemption inquiry. As the court's opinion makes clear elsewhere, state law may preempt local law when local law prohibits not only what a state statute "demands" but also what the statute permits or authorizes. (See maj. opn., *ante*, at pp. 31–32, 34–35, discussing *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 293 (*Cohen*); *Great Western Shows v. County of Los Angeles* (2002) 27 Cal.4th 853, 867–868 (*Great Western Shows*).

In a similar vein, the second sentence of the above statement — "no inimical conflict will be found where it is reasonably possible to comply with both

1

the state and local laws" (maj. opn., *ante*, at p. 10) — also should not be misunderstood. If state law authorizes or promotes, but does not require or demand, a certain activity, and if local law prohibits the activity, then an entity or individual can comply with both state and local law by not engaging in the activity. But that obviously does not resolve the preemption question. To take an example from federal law, the Federal Arbitration Act (FAA) promotes arbitration, and a state law prohibiting arbitration of employment disputes would be preempted. (See *AT&T Mobility LLC v. Concepcion* (2011) 563 U. S. __ [131 S.Ct. 1740, 1747].) Such preemption obtains even though an employer can comply with both the FAA, which does not *require* employers to enter into arbitration agreements, and the state law simply by choosing not to arbitrate employment disputes.

Accordingly, in federal preemption law, we find a more complete statement of conflict preemption: " 'We have found implied conflict pre-emption where it is "impossible for a private party to comply with both state and federal requirements" [citation], *or* where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' " (*Sprietsma v. Mercury Maine* (2002) 537 U.S. 51, 64–65, italics added.) This more complete statement no doubt applies to California law. Local law that prohibits an activity that state law intends to promote is preempted, even though it is possible for a private party to comply with both state and local law by refraining from that activity. (See *Great Western Shows*, *supra*, 27 Cal.4th at pp. 867–868; *Cohen*, *supra*, 40 Cal.3d at p. 293.)

I do not understand today's opinion to hold otherwise. In this case, defendants argue that the Medical Marijuana Program (MMP) authorizes and intends to promote what the City of Riverside prohibits: the operation of medical marijuana dispensaries. If such legislative authorization were clear, then the

2

ordinance in question might well be preempted.  But I agree with my colleagues that although the MMP provides medical marijuana cooperatives and collectives with a limited exemption from state criminal liability, "state law does not 'authorize' activities, to the exclusion of local plans, simply by exempting those activities from otherwise applicable state prohibitions." (Maj. opn., *ante*, at p. 32.) As the court's opinion makes clear, notwithstanding some language in the MMP regarding the promotion of medical marijuana cooperatives and collectives, "the MMP itself adopts but limited means of addressing these ideals.  Aside from requiring local cooperation in the voluntary medical marijuana patient identification card program, the MMP's substantive provisions simply remove specified state-law sanctions from certain marijuana activities, including the cooperative or collective cultivation of medical marijuana by qualified patients and their designated caregivers.  [Citation.]  The MMP has never expressed or implied any actual limitation on local land use or police power regulation of facilities used for the cultivation and distribution of marijuana." (Maj. opn., *ante*, at p. 33.)

Because state law does not clearly authorize or intend to promote the operation of medical marijuana dispensaries, I agree that the City of Riverside's prohibition on such dispensaries is not preempted.

LIU, J.

3

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** City of Riverside v. Inland Empire Patient's Health and Wellness Center, Inc.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 200 Cal.App.4th 885
**Rehearing Granted**

_____

**Opinion No.** S198638
**Date Filed:** May 6, 2013
_____

**Court:** Superior
**County:** Riverside
**Judge:** John D. Molloy

_____

**Counsel:**

Law Offices of J. David Nick and J. David Nick for Defendants and Appellants.

Joseph D. Elford for Americans for Safe Access as Amicus Curiae on behalf of Defendants and Appellants.

Gregory P. Priamos, City Attorney, James E. Brown and Neil Okazaki, Deputy City Attorneys; Best Best & Krieger, Jeffrey V. Dunn, Lee Ann Meyer, Roderick E. Walston, Daniel S. Roberts, Laura Dahl; Greines, Martin Stein & Richland, Timothy T. Coates and Gary D. Rowe for Plaintiff and Respondent.

Carmen A. Trutanich, City Attorney (Los Angeles) and William W. Carter, Chief Deputy City Attorney, for City of Los Angeles as Amicus Curiae on behalf of Plaintiff and Respondent.

Jones & Mayer, Martin J. Mayer, Krista MacNevin Jee and Elena Q. Gerli for California State Sheriffs' Association, California Police Chiefs Association and California Peace Officers' Association as Amici Curiae on behalf of Plaintiff and Respondent.

Burke, Williams & Sorensen, Thomas B. Brown and Stephen A. McEwen for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

J. David Nick
Law Offices of J. David Nick
345 Franklin Street
San Francisco, CA  94102
(415) 552-4444

Jeffrey V. Dunn
Best Best & Krieger
18101 Von Karman Avenue, Suite 1000
Irvine, CA  92612
(949) 263-2600