Filed 4/29/14

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B239380 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA067133) |
| v. | |
| BRYAN EDWARD MITCHELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hilleri G. Merritt, Judge.  Affirmed as modified.

Kestenbaum, Eisner & Gorin, Alan Eisner and Brad Kaiserman for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Blythe J. Leszkay and Gary A. Lieberman, Deputy Attorneys General for Plaintiff and Respondent.

---

[*]     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts III (B) and (C).

# I.  INTRODUCTION

Defendant, Brian Edward Mitchell, appeals after he was convicted of marijuana cultivation.  (Health & Saf. Code,[1] § 11358.)  In the published portion of this opinion, we discuss defendant's contention he was entitled to the protections of section 11362.775.  Section 11362.775 was adopted pursuant to the Medical Marijuana Program Act.  Defendant entered into two written agreements to grow marijuana every month and sell it to a for-profit corporation that operated a collective of which he was a member.  Defendant anticipated being paid $50,000 to $60,000 annually for marijuana delivered to the for-profit corporation.  Under these circumstances, defendant may not secure the immunity provided by section 11362.775.  With minor sentencing modifications, we otherwise affirm.

# II.  THE FACTS

## A.  The Formation Of The For-Profit Corporation "Keeping It Medical"

On November 6, 2006, Norman Conway, as incorporator, filed a brief 12-line articles of incorporation for Keeping It Medical with the California Secretary of State.  The Keeping It Medical corporation was organized as a for-profit enterprise.  According to Mr. Conway, the corporation never ended up "making a profit or anything" and he lost his house over the business.  The other partners in the Keeping It Medical enterprise also lost money.  When asked for the annual gross sales between 2006 and 2010, Mr. Conway testified, "It varied due to like -- there [were] some union disputes or strikes, I guess, through the industry, so I believe that sometime in 2008 or -9, we lost probably 60 percent of our normal patient load that would be coming in."  Mr. Conway explained the only persons who suffered a loss were the four partners who invested in the business.

---

[1]  Future statutory references are to the Health and Safety Code unless otherwise noted.

2

Because he was living off of the refinancing of his house, Mr. Conway testified he took in "maybe $10,000" per year. However, the partners, according to Mr. Conway, never actually earned anything: "But we never really earned anything. We kept putting it in and putting it in and -- there were certain things that happened that were supposed to come with this which was going to be something, you know, that we could use to hopefully get us up and running."

Mr. Conway testified that he was a manager of the "K.I.M. Collective" which was formed in October, 2006. The acronym K.I.M. is shorthand for Keeping It Medical. Mr. Conway registered the K.I.M. Collective with the City of Los Angeles Office of Finance in 2006 under the name Keeping It Medical. Mr. Conway testified the collective at one time had close to 1,000 members. The Keeping It Medical entity was registered at 3322 Barham Boulevard. City of Los Angeles finance office records described the Keeping It Medical business as "Retail Sales" and "Professions/Occupations." An attorney, David Ericson, provided legal services which led to the incorporation of Keeping It Medical.

Mr. Conway explained the procedures by which a member could obtain marijuana from the collective. Mr. Conway testified, "[T]hey would have to show a doctor's recommendation and have a valid California I.D., and then we would have to call the doctor that was on the recommendation and verify it . . . ." Once the identification and verification process was concluded, a person desiring to purchase marijuana would sign a membership agreement. Some unidentified collective members received marijuana at no cost. However, defendant testified he paid money for the marijuana he obtained from the collective.

Persons other than Mr. Conway or his three partners would collect money from marijuana purchasers. Mr. Conway's sole source of income was the proceeds of the collective. According to Mr. Conway, persons who brought marijuana to the collective were paid money in exchange. The collective offered classes to members on how to grow and cook marijuana. When the collective closed due to financial difficulties, none of its members received bills to pay Mr. Conway back for his losses.

B.  Defendant Agrees To Provide Marijuana To Keeping It Medical And Receive
$50,000 To $60,000 Annually In Return


In 2002, defendant fractured his spine and was constantly in pain.  On September 21, 2007, defendant visited Dr. Wesley Albert.  Dr. Albert approved the use of marijuana for defendant's symptoms.  The approval was granted for one year.  There is no evidence defendant later secured approval from any physician after the expiration of the one-year time period.

Defendant secured a medical marijuana card.  On November 7, 2007, defendant executed a K.I.M. Membership Agreement.  Defendant's membership agreement states: he had received a written doctor's recommendation for a medical condition for which marijuana provided relief; under "Prop 215 & SB420," he had the right to cultivate and have safe and affordable access to medicinal marijuana; his contributions for products he acquired at K.I.M. Inc. were to be used to ensure the continuing operation of the collective; "[the] transaction in no way constitute[d] commercial promotion"; the money he paid helped the collective continue to provide its members with marijuana for their medical needs; and K.I.M. Inc. was a collective for the marijuana "in possession of all its members."  The membership agreement concludes:  "I understand that by signing this membership agreement, I declare under penalty of perjury all information to be truthful and accurate.  Also, I will comply with all the guidelines for Prop 215 & SB420."

Mr. Conway testified defendant would regularly spend time at the Barham Boulevard establishment.  Mr. Conway testified defendant helped with the collective. Mr. Conway described defendant's activities at the collective:  "Just help us with the cultivation, or that, you know, introductory grow classes.  We had a small grow there so that patients could see what they were dealing with, what to expect, and what they will have, and he helped us do that.  [¶]  And we shared a lot of good books . . . .  We would just hang out, I guess."  Defendant described his role in the collective as that of a patient who taught a cultivation class.  Defendant testified he would bring marijuana to the collective.  But defendant denied taking money from persons he described as patients.

4

Defendant and Mr. Conway began discussing growing marijuana for the collective.  After reviewing the Attorney General's marijuana guidelines, Mr. Conway and defendant agreed that it "seemed that the collective was in a need" of more marijuana for its membership.  Defendant testified there was very limited space at the Barham Boulevard collective for growing marijuana.

As result, defendant met twice with an attorney, Stewart Richlin.  Defendant paid money to Mr. Richlin who provided the following advice:  "He informed me that in order to grow legally for my collective, there were some documents that I could fill out.  There were some certain parameters that I . . . had to stay within, but he advised me essentially . . . that I was cleared as a patient and a member of the collective to engage in this activity."  Defendant then secured a number of documents which he believed would allow him to lawfully grow marijuana.

On August 27, 2009, the Internal Revenue Service issued an employer identification number for "Herbmetics Inc."  The location of the business is identified as "717 N. Cahuenga Blvd[.,] Unit B5," which is defendant's residence.  On August 28, 2009, defendant submitted an application for a seller's permit to the State Board of Equalization.  The application was submitted under the name of Herbmetics, Inc. and lists defendant's residence address as the place of business.  Jin Lee is identified as a personal reference.  The application requests the applicant to identify the items that would be sold and defendant responded, "A Nonprofit  Corp. To Cultivate Medical Cannabis."  The seller's permit application specifies that the projected monthly gross sales would be $5,000 (or $60,000 annually).  Defendant is listed as the person who would be maintaining the business records for Herbmetics, Inc.  On September 15, 2009, the State Board of Equalization issued a seller's permit to Herbmetics, Inc.  At trial, despite the fact he had a seller's permit, defendant denied ever selling or intending to sell any marijuana.  There is no evidence any marijuana was grown in defendant's residence after August 28, 2009, the date he applied for the State Board of Equalization seller's permit.  Defendant never informed the State Board of Equalization that the address where the marijuana was being grown was in the City of San Fernando.

5

On September 22, 2009, defendant executed restated articles of incorporation for Herbmetics, Inc. The corporate name is "Herbmetics, Inc. a California Non-profit Mutual Benefit Corporation" which has as its purpose, "The specific purpose of this corporation is to facilitate herbal or natural remedies for chronically ill patron members who are California residents with HIV, AIDS, chronic pain, chronic spasticity, glaucoma, arthritis, cancer, migraine, wasting syndrome, and/or other conditions for which licensed medical physicians may recommend such herbal or natural remedies pursuant to California Law." The restated articles of incorporation were executed by defendant in his capacity as president and secretary of the corporation.

On September 22, 2009, defendant submitted a business license application to the City of San Fernando. The name of the business was San Fernando Luthier. The business is described as "manufacturing string instruments" and identified defendant as the owner. Defendant listed his home address on Cahuenga Boulevard on the application. Ms. Lee is identified as an emergency contact. The application indicates that no flammable or hazardous materials will be stored in the premises. The business license application makes no reference to growing marijuana. City of San Fernando records indicate San Fernando Luthier operated as a sole proprietorship. City of San Fernando business records reflect that defendant is the person responsible for the premises. The license expired on December 31, 2009. Defendant failed to renew the license.

Also on September 22, 2009, defendant applied for a business occupancy permit from the City of San Fernando. The business is described as "manufacturing of stringed instruments" and the form contains the same identifying information as on the business license application. On October 14, 2009, the City of San Fernando issued a business occupancy permit to defendant. The business occupancy permit allows defendant to manufacture string instruments including guitars on the premises.

On September 23, 2009, defendant submitted an application for a second seller's permit to the State Board of Equalization for a business entitled "San Fernando Luthier." Defendant identified himself as the sole owner of San Fernando Luthier. No other person is identified as a co-owner or partner in San Fernando Luthier. The second application

6

indicates the business address will be 1933 First Street in San Fernando. The second application makes no reference to the August 28, 2009 application of Herbmetics, Inc. Defendant's second State Board of Equalization seller's permit application responds to the question as to what would be sold as follows, "Guitars [and] Drums Custom Made." Further, the second seller's permit application lists as a personal reference, Alexander Behar, who is not otherwise identified during the trial. No reference is made in the second seller's permit application to growing marijuana. The projected monthly gross sales are listed as $5,000 on the seller's permit application (or $60,000 annually). Ms. Lee is identified as the person who would be keeping the records for San Fernando Luthier. The State Board of Equalization issued a seller's permit to San Fernando Luthier and defendant on November 1, 2009.

Mr. Conway agreed to have defendant grow marijuana on behalf of the collective. On November 18, 2009, defendant entered into two agreements with the "K.I.M. Collective" at the 3323 Barham Boulevard address in Los Angeles. The documents are entitled, "Caregiving/Cooperative Grower/Provider/Transportation/Designation." According to Ms. Lee, these documents were prepared by Mr. Richlin. The two agreements are the same except one was between Herbmetics, Inc. and Keep it Medical. There is no evidence Herbmetics, Inc. is a member of the K.I.M. Collective. The second agreement was between defendant and Keep It Medical. Both agreements are executed by only Mr. Conway. Both agreements have notary's acknowledgments attached. One of the acknowledgments states defendant signed the agreement although in fact he did not. Defendant is named as a party to one agreement. Herbmetics, Inc. is named as the party to the other agreement. The agreements state that defendant and Herbmetics, Inc. would act as a grower for "our" organization. The agreements state that Keeping It Medical: has 600 "medical cannabis patients" with written recommendations on file; the "grower/provider" is a collective member authorized to "provide and transport medical quality cannabis for our organization"; and in particular the "grower/provider" is to provide marijuana for 100 members of "our organization." The designation as a grower was effective immediately and could be terminated on 90 days' notice. At another point

7

in the agreements, they state:  "[T]he only interest we have in common is the independent and separate desire to assist ill California patients pursuant to the law.  The Organization has the right to inspect and accept or reject any herbal medicine presented hereunder without obligation.  No particular amount of medicine, donation or date is contemplated hereby.  This document is intentionally silent on any price, donation or refund as to expenses if any, which may be arranged between the Organization and you, to be determined on a case by case basis, as per California law."  According to Mr. Conway, the agreements were signed in front of a notary public.

In 2010, Mr. Conway testified there was between 300 to 600 members of the collective.  But in the six-month period after December 2009 or January 2010, approximately 300 members visited the collective.  At another point while testifying, Mr. Conway stated the collective had "at least thousand" members.  When cross-examined, Mr. Conway admitted that in the six months after December 2009 or January 2010, "only . . . about 300" members of the collective were coming in and "getting" marijuana.  Then Mr. Conway changed his testimony and stated during that six-month time period "somewhere between 100 to 200" members of the collective were purchasing marijuana.  Mr. Conway testified that defendant was only going to grow marijuana for 100 collective members.  Mr. Conway testified at one point that defendant began growing marijuana for the collective in October or November 2009.  Defendant was obligated to produce marijuana for the collective and its patients.  Mr. Conway admitted defendant was to be paid money in exchange for the marijuana. Mr. Conway testified that defendant was not the only one who was providing marijuana to the collective.  Later while testifying, Mr. Conway stated defendant never provided the collective with any marijuana.

Mr. Conway testified that "other" members of the collective continued to bring in "leftover medication."  When asked how many collective members brought in marijuana, Mr. Conway testified, "It just depended on the various months."  Mr. Conway testified the other collective members were reimbursed for the marijuana they had provided: "Normally they would donate it, and then at the end of the week or whenever, they could

8

be compensated for it based on whenever that the patients had, you know, deemed it to be." Later, when cross-examined, Mr. Conway admitted, as noted, that collective members who provided marijuana were paid money. Because defendant never provided any marijuana, Mr. Conway testified the collective ceased operations in May or June, 2010.

## C.  Defendant Builds The Marijuana Growing Facility

Defendant then began to find a location to grow marijuana. Defendant would discuss with the potential lessors his intention to grow marijuana for his collective. On September, 10, 2009, defendant *and* Herbmetics, Inc. paid a security deposit to the property owner, Bassily Kamar, in the sum of $5,000 for the premises at 1933 First Street in the City of San Fernando. Ms. Lee gave the check to Mr. Kamar. Defendant then built out the space in order to grow marijuana.

Tim McBride helped defendant construct the marijuana growing facility. According to Mr. Conway, Mr. McBride would help out at the collective and work on guitars and drums. Defendant and Mr. McBride met at the collective. Defendant described Mr. McBride as a "patient gardener" who performed marijuana gardening duties at the small in-house collective garden. Mr. McBride and defendant discussed using open space in the First Street premises for a guitar manufacturing shop. (We will provide further background about the abortive guitar manufacturing venture later in this opinion.) Mr. McBride stopped assisting in the construction in mid-December, 2009. Mr. McBride was to be compensated for his work with the marijuana growing facility.

Defendant purchased lights, soil for the plants, fans to cool the lighting, and air-conditioning for use in the area where plants were grown. In addition, in order to create three separate rooms in the space where marijuana would be grown, defendant purchased lumber. Defendant described his purchases as expensive.

9

### D. The Police Discover Defendant's Marijuana Growing Operation

On January 28, 2010, Officer Jorge Cervantes of the San Fernando Police Department arrived at the premises rented by defendant at 1933 First Street. Officer Cervantes went to the business in response to a citizen complaint indicating a possible break-in at the 1933 First Street address had occurred. The windows for the premises were covered with a "black plastic tarp-type" of material. Officer Cervantes saw a broken sectional door and glass. The sectional door had been forced open.

Inside the premises, the investigators found "man-made little make shift" rooms divided by tarps. Officer Cervantes saw numerous marijuana plants in various stages of growth in the different rooms. While testifying, Officer Cervantes described the area where marijuana plants were being grown as being one and one-half times the size of the courtroom. Without objection, the trial court described the courtroom as being 40 feet long and 39 feet wide.

In addition to the marijuana, Officer Cervantes saw extensive heating and cooling equipment including fans, ventilation ducts, irrigation systems and transformers. The fans in the premises are used for several purposes. The fans kept the temperatures down and carbon dioxide moving throughout the growing area. In the grow areas there were carbon dioxide generators. In addition, there was an air scrubber or carbon filter which conceals the smell of marijuana. The use of such air filters in marijuana grow operations is common. There were 1,000-watt bulbs in the building. Also, there were ballasts which were essential for the operation of the thousand watt bulbs. Throughout the grow areas, there were air ducts to move air all the way through the premises. Growing indoors is more profitable than outdoors because the elements can be controlled.

There were 22 so-called "grow lights" and 5 fluorescent or metal halide lights on the premises. The lighting extended throughout the growing areas. Officer Cervantes also saw work benches and bottles of plant nutrients. In terms of the materials on one bench, defendant described them as follows: "[T]hey are all chemicals. They are all nutrients that I used for . . . plant food. This is [the] two main chemicals, and then, you

know, there's like 25 or so other different small nutrients, hormones and things that you use to grow." In the main aisle of the premises, there were four fully grown plants which were five feet tall. Further, there were calendars on the premises. The calendars kept track of the growing schedule for the plants.

In the east growing area, there were 42 marijuana plants that were approximately 5 feet tall. In the nursery area of the premises, there were five fully grown plants. These larger plants in the nursery area were approximately five feet tall. Also in the nursery area were 86 small plants which ranged in size from 11 and 12 inches in height. These 86 smaller plants were described by defendant as "clones" which is the room where the growing process commences. These plants were kept under lights 24 hours per day. Officer Cervantes described these plants as clones. Defendant described the purpose and function of the nursery area thusly: "The nursery is where I kept large mother plants, as various experts have described it, and cut small branches from them, dipped them in . . . a rooting hormone, put them in a high humidity little tray and add nutrients so that they will sprout roots. That's how you make the plants."

The next growing area identified by defendant as the "vegetative growth" area which he described as follows, "The next phase is the vegetative growth stage where you take them from the nursery, the small plants, you put them in a pot, essentially, and give them light, food, and some love, and they get bigger, grow bigger root systems . . . ." In the vegetative growth area, defendant testified that the minimum light-cycle was 18 hours of light. In the vegetative growth room, there were six 1,000 watt lights.

Officer Cervantes described the remaining room as the main grow room. There were 70 fully grown marijuana plants which were up to 5 feet tall. Defendant described the area as follows: "That is the flowering area. That is where the full cannabis medication is produced from the plant. [¶] . . . In this flowering area, you take the plants from vegetative and install them here and essentially shut the lights off on them to make them think its fall, it's time to reproduce." In flowering or main grow room, the light cycle was 12 hours on and 12 hours off. Defendant testified there were sixteen 1,000-

11

watt lights in the area described as the "main grow" or "flowering" area. When testifying, defendant admitted that he was responsible for the entire cultivation.

Part of defendant's growing operation consisted of the use of mother plants. In defendant's grow operation, there were so-called mother plants which were approximately five feet high. Clippings were taken from those plants and placed in rock wool to begin growing. These clippings were referred to as the "clones of the mother plants" and were under lights for 18 or 24 hours a day.

Officer Cervantes testified after the burglary was discovered, defendant arrived at the premises. Defendant admitted he was the owner and responsible person for all the property inside the building. Defendant never said the marijuana belonged to a collective or that he was working in conjunction with anybody else. Defendant said he spent $1,600 per month for electricity. After walking through the premises, defendant said approximately $10,000 worth of marijuana was stolen during the burglary.

Officer Cervantes did not see any: guitars; lutes; guitar strings; drums; wood being crafted for musical instruments; or any wood-cutting materials. However, defendant identified a bench that he built which was to be used by the "San Fernando Luthier and Stringed Instrument Manufacturing Business." The bench takes up only a very small portion of the floor space in the premises. Defendant had discussed opening such a business with Mr. McBride. However, the guitar and stringed instrument business never got "off the ground." Defendant admitted it was fair to say that the musical business never even got started. By mid-December 2009, it was clear nothing was going to be happening with the guitar business. Defendant testified why his business license application failed to indicate marijuana would be grown on the premises. As noted, the application referred to the name of the business as "San Fernando Luthier" and made no reference to growing marijuana. Defendant testified: "As it was explained to me, my patient garden isn't a business. San Fernando Luthier was the only for-profit business that was going to be occupying this space." Mr. McBride's name is not mentioned on any of the City of San Fernando documents. Defendant claimed he had no effective way of contacting Mr. McBride any further.

12

As noted, defendant arrived at the marijuana growing facility on January 28, 2010, after the police had arrived. Defendant presented his medical marijuana identification card and led the investigators throughout the area where marijuana was being grown. Defendant presented documents indicating he was cultivating marijuana for the collective. Defendant discussed the issue of compensation for growing the marijuana with Officer Cervantes. Defendant testified, "I told the officer that I had been advised that I was allowed to keep $50,000 for myself for my contributions to the collective garden." Officer Cervantes described defendant's statement about being compensated for growing marijuana, "He said that he was only allowed to keep $50,000 a year for his contributions to the medical marijuana dispensaries." (Defendant denied saying he intended to sell marijuana to a dispensary.) Defendant described his plan, "The plan was to cultivate for my collective and to be compensated for my time."

Officer Cervantes described defendant as cooperative throughout the process during which the marijuana grow operation was disassembled and the plants seized pursuant to a search warrant. Defendant helped disassemble the marijuana growing facility. Officer Cervantes and defendant discussed the marijuana grow operation. Defendant said that he had been cultivating marijuana for about five years but only in San Fernando since October, 2009. Defendant denied doing so with any other person. Defendant said he dispensed marijuana only to marijuana dispensaries. Defendant made it clear he did not distribute or dispense marijuana to patients but only to dispensaries.

Defendant never paid any taxes nor filed tax return for 2009 for any of his entities. Defendant only filed personal income tax returns for 2009. Throughout the period of time defendant was building his marijuana grow operation, he had no other income. At one point defendant stated it was his intention to earn up to $50,000 per year from marijuana transactions. As noted, the two State Board of Equalization seller's permits indicate Herbmetics, Inc. or defendant was expected to earn $60,000 annually each. Defendant testified he earned no money from his marijuana growing venture, "It would have been nice to earn one dollar from my work that I did in the grow house, but we didn't earn any." Defendant then denied expecting a certain amount from his marijuana

13

growing activities. But defendant testified, "I was expecting to be paid for my efforts . . . ." Defendant testified: "I expected to be paid. I didn't know what or how or how much or when." Defendant expected to also be reimbursed for his expenses which included setting up the grow facility and time spent gardening. Defendant admitted his work at the San Fernando marijuana growing facility was his livelihood at that time. And defendant admitted that it would continue to be his livelihood in terms of providing money with which to live. When cross-examined, defendant refused to describe the value of the marijuana he would be growing.

## E. Opinion Testimony

Detective Eric Bixler of the Los Angeles Police Department testified concerning the potential value of defendant's marijuana growing operations. The police reports in this case indicated that twenty-two 1,000-watt lights were seized inside defendant's growing area. As a general rule, in Detective Bixler's opinion, twenty-two 1,000-watt lights would produce 1,100 grams of dried manicured product every 60 days. The 60-day time frame is the growing cycle for marijuana. Thus, 22 lights would produce annually 24,200 grams or 319 pounds of dried, manicured product. The retail value of marijuana produced in such a grow operation would be $2.9 million annually. The wholesale value, calculated on the basis of the price being paid by marijuana dispensaries, would be $3,500 per pound. At $3,500 per pound, the annual income to a marijuana grower utilizing twenty-two 1,000-watt lights would be $1,116,500.

Defendant relied upon the testimony of Christopher Conrad, an author, newspaper publisher and hashish and marijuana museum curator. Mr. Conrad assumed that only sixteen 1,000-watt lights were used to illuminate flowering plants. In his view, the typical yield of marijuana would be 7,264 grams of marijuana every 60 days. In Mr. Conrad's view, very few growers should expect to get 1,100 grams per 1,000-watt light every 60 days.

14

Detective Bixler testified in rebuttal.  Detective Bixler calculated the annual yield based upon the use of sixteen 1,000-watt lights.  Detective Bixler calculated the annual yield of marijuana from sixteen 1,000-watt lights as 424 pounds.  The wholesale price of 424 pounds marijuana is $114,000.  The retail value of the marijuana is $2.1 million.  Detective Bixler's opinion concerning the yield from 1,000-watt lights was premised upon his interviews of thousands of arrestees.  Detective Bixler testified:  "The thousands of people I've arrested for the cultivation of marijuana, possession for sales of marijuana, all attribute that they get at least this, at least a thousand grams of dried, manicured product every 60 days.  So this is common knowledge.  The only time I have heard different is from defense experts."

## III.  DISCUSSION

### A.  Sections 11362.5 And 11362.7 Et Seq.

Defendant contends he is entitled to rely on the defenses created by section 11362.775.  Before discussing why section 11362.775 does not apply to this case, it is appropriate to discuss the development of defenses to California's marijuana cultivation statute, section 11358.[2]  As our Supreme Court has explained, this is a defense only to California law.  Marijuana cultivation as occurred here is a federal felony and criminal liability extends not merely to defendant but to those who aided and abetted him in his growing activities.  (21 U.S.C. § 801 et seq.; *City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729,738-339 (*City of Riverside*); *Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 927 (*Ross*).)

---

[2]  Section 11358 states, "Every person who plants, cultivates, harvests, dries, or processes any marijuana or any part thereof, except as otherwise provided by law, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code."

15

In 1996, the voters adopted section 11362.5, subdivision (d) which states, "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician."  Our Supreme Court has described the section 11362.5: "as a narrow measure with narrow ends"; "'a narrowly drafted statute'" (*People v. Mentch* (2008) 45 Cal.4th 274, 286, fn. 7 (*Mentch*); and modest in terms of its goals.  (*City of Riverside*, *supra*, 56 Cal.4th at p. 744.)  When approved by the voters, section 11362.5 was not intended to decriminalize marijuana on a wholesale basis nor eviscerate this state's marijuana laws.  (*Mentch*, *supra*, 45 Cal.4th at p. 286, fn. 7; *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 772-773.)  Our Supreme Court  described the views of the proponents of section 11362.5, "'[T]he proponents' ballot arguments reveal a delicate tightrope walk designed to induce voter approval, which we would upset were we to stretch the proposition's limited immunity to cover that which its language does not.'"  (*Ross*, *supra*, 42 Cal.4th at p. 930, quoting *People v. Galambos* (2002) 104 Cal.App.4th 1147, 1152.)

In 2003, the Legislature enacted the Medical Marijuana Program Act which contains section 11362.775, the statutory defense asserted by defendant.  (Stats. 2003, ch. 875, § 2, pp. 6431-6432.)  Our Supreme Court described the overall purpose of the Medical Marijuana Program Act:  "When it later adopted the [Marijuana Program Act], the Legislature declared this statute was intended, among other things, to '[c]larify the scope of the application of [section 113652.5] and facilitate the prompt identification of qualified [medical marijuana] patients and their designated primary caregivers' in order to protect them from unnecessary arrest and prosecution for marijuana offenses, to '[p]romote uniform and consistent application of [section 113652.5] among the counties within the state,' and to '[e]nhance the access of patients and caregivers to medical marijuana through collective, cooperative cultivation projects' (Stats. 2003, ch. 875, § 1, subd. (b), pp. 6422, 6423)."  (*City of Riverside*, *supra*, 56 Cal.4th at p. 744.)  Yet, our Supreme Court characterized the entirety of the Medical Marijuana Program Act, which

16

includes section 11362.775, as limited and specific.  (*City of Riverside*, *supra*, 56 Cal.4th at p. 745; see *Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 982.)  In addition, our Supreme Court described the new defenses provided by the Medical Marijuana Program Act as "additional narrow medical exceptions" to sections 11359 and 11360.  (*Ross*, *supra*, 42 Cal.4th at p. 929, fn. 3.)  Also, our Supreme Court has explained, "[While the [Medical Marijuana Program Act] 'does convey additional immunities against cultivation and possession for sale charges to specific groups of people, it does so only for specific actions; it does not provide globally that the specified groups of people may never be charged with cultivation or possession for sale.'"  (*City of Riverside*, *supra*, 56 Cal.4th at p. 748 quoting *Mentch*, *supra*, 45 Cal.4th at p. 290.)  Our Supreme Court has further described section 11362.5 and the Medical Marijuana Program Act as collectively being of limited reach.  (*City of Riverside*, *supra*, 56 Cal.4th at p. 749; see *Maral v. City of Live Oak*, *supra*, 221 Cal.App.4th at p. 982.)  Our Supreme Court has stressed that neither section 11362.5 nor the Medical Marijuana Program Act has created a "'broad right to use marijuana without hindrance nor inconvenience.'"  (*City of Riverside*, *supra*, 56 Cal.4th at p. 753; *Ross*, *supra*, 42 Cal.4th at p. 928.)

We now turn to the limited immunities available under section 11362.5, subdivision (d).  Defendant does not argue he could assert a defense under section 11362.5, subdivision (d).  And with good reason because he does not fit within the exemptions from criminal culpability in section 11362.5, subdivision (d)[3]  The staggering

---

[3]  Section 11362.5 states in its entirety:  "(a) This section shall be known and may be cited as the Compassionate Use Act of 1996.  [¶]  (b)(1)  The people of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows:  [¶]  (A)  To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief.  [¶]  (B)  To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction.  [¶] (C)  To encourage the federal and state governments to implement a plan to provide for

17

quantity of marijuana he possessed (including that which was stolen during the burglary) exceeded that allowable amount under section 11362.5, subdivision (d). Under section 11362.5, subdivision (d), the maximum marijuana that may be possessed is that reasonably related to the user's medical needs. (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1549 ["The statute certainly does not mean, for example, that a person who claims an occasional problem with arthritis pain may stockpile 100 pounds of marijuana just in case it suddenly gets cold."]; see *People v. Kelly* (2010) 47 Cal.4th 1008, 1023-1024.) In addition, defendant did not qualify as a "primary caregiver" within the meaning of section 11362.5, subdivision (e). (*Mentch*, *supra*, 45 Cal.4th at p. 283 ["'For a person to be a qualified primary caregiver, he or she must be "designated" as such by a qualified patient, *and* must have "consistently assumed responsibility" for the qualified patient's "housing, health, or safety.'""]; *People v. Mower* (2002) 28 Cal.4th 457, 475 [same].)

In terms of the Medical Marijuana Program Act, its principal defenses do not apply to defendant. The most extensive set of defenses are found in section 11362.765, subdivision (a) which states in part, "Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, on that sole basis, to criminal liability under Section . . . 11358. . . . However, nothing in this section shall authorize the individual to smoke or otherwise consume marijuana unless otherwise authorized by this article, nor shall anything in this section authorize any individual or group to

---

the safe and affordable distribution of marijuana to all patients in medical need of marijuana. [¶] (2) Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes. [¶] (c) Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes. [¶] (d) Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician. [¶] (e) For the purposes of this section, 'primary caregiver' means the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person."

18

cultivate or distribute marijuana for profit." 11362.765, subdivision (b)[4] lists a series of defenses, none of which applies to defendant. 11362.765, subdivision (b)(1) involves possession for personal use. As in connection with section 11362.5, subdivision (d), the quantity of marijuana on defendant's premises, including that taken during the burglary, exceeded the amount reasonably necessary for defendant's personal needs. (*People v. Wayman* (2010) 189 Cal.App.4th 215, 222-223 [under § 11362.765, subdivision (b)(1), amount of marijuana limited that reasonably related to a patient's needs].) Section 11362.765, subdivision (b)(2) does not apply to defendant as it applies only to a designated caregiver. There is no evidence defendant meets the aforementioned standard of a primary caregiver. As to section 11362.765, subdivision (b)(3), there is no evidence defendant, in growing the marijuana in San Fernando, provided assistance to the enumerated persons in administering or growing marijuana. Finally, section 11362.765, subdivision (c)[5] relating to compensation for actual expenses and services has no application to defendant as it only applies to violations of section 11359 and 11360.

---

[4] Section 11362.765, subdivision (b) states: "(b) Subdivision (a) shall apply to all of the following: [¶] (1) A qualified patient or a person with an identification card who transports or processes marijuana for his or her own personal medical use. [¶] (2) A designated primary caregiver who transports, processes, administers, delivers, or gives away marijuana for medical purposes, in amounts not exceeding those established in subdivision (a) of Section 11362.77, only to the qualified patient of the primary caregiver, or to the person with an identification card who has designated the individual as a primary caregiver. [¶] (3) Any individual who provides assistance to a qualified patient or a person with an identification card, or his or her designated primary caregiver, in administering medical marijuana to the qualified patient or person or acquiring the skills necessary to cultivate or administer marijuana for medical purposes to the qualified patient or person."

[5] Section 11362.765, subdivision (c) states, "A primary caregiver who receives compensation for actual expenses, including reasonable compensation incurred for services provided to an eligible qualified patient or person with an identification card to enable that person to use marijuana under this article, or for payment for out-of-pocket expenses incurred in providing those services, or both, shall not, on the sole basis of that fact, be subject to prosecution or punishment under Section 11359 or 11360."

19

The other limited defense of consequence to our case created by the Medical Marijuana Program Act is section 11362.775 which states, "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who associate within the State of California in order *collectively or cooperatively to cultivate marijuana for medical purposes, shall not solely on the basis of that fact* be subject to state criminal sanctions under Section . . . 11358 . . . ." (Italics added.) This defense is limited, as set forth in the highlighted language, to potential criminal liability *based solely on the fact* the accused engaged in the collective or cooperative marijuana cultivation. Defendant has not been convicted of any crime "solely because" of his collective or cooperative marijuana cultivation. Here, defendant operated, by himself, a sophisticated marijuana growing operation, for which he expected potentially to be paid $50,000 to $60,000 per year. Defendant expected to live off of the income from his marijuana growing venture and to be compensated for all of his expenses. The amount of marijuana he anticipated growing exceeded any quantity that would legally be for his personal medical use. There is no evidence he had any caregiver relationship with any other person in the collective. Defendant commenced his marijuana growing operations only after entering into two written notarized contracts prepared by an attorney with a for-profit corporation, Keeping It Medical. We are in accord with the argument of the Attorney General that defendant's broad construction of section 11362.775 has no merit.

Our analysis of the limited scope of section 11362.775 is consistent with that in *Mentch*, *supra*, 45 Cal.4th at page 292 concerning section 11362.765, subdivisions (a) and (b)(3). (See fn. 4, *supra*.) Here is how our Supreme Court analyzed portions of section 11362.765, subdivision (b)(3) relating to administering, advising and counseling qualified marijuana users: "[A]s relevant here, subdivision (b)(3) of section 11362.765 grants immunity to a specific group of individuals—those who assist in administering medical marijuana or acquiring the skills necessary to cultivate it—for specific conduct, namely, assistance in the administration of, or teaching how to cultivate, medical marijuana. This immunity is significant; in its absence, those who assist patients or

20

primary caregivers in learning how to cultivate marijuana might themselves be open to prosecution for cultivation. (§ 11358.)" (*Mentch*, *supra*, 45 Cal.4th at p. 291; fn. omitted.) And here is how our Supreme Court explained the *limited* extent of the immunity provided by section 11362.765, subdivisions (a) and (b)(3): "Here, this means Mentch, to the extent he assisted in administering, or advised or counseled in the administration or cultivation of, medical marijuana, could not be charged with cultivation or possession for sale 'on that sole basis.' (§ 11362.765, subd. (a).) It does not mean Mentch could not be charged with cultivation or possession for sale on *any* basis; to the extent he went beyond the immunized range of conduct, i.e., administration, advice, and counseling, he would, once again, subject himself to the full force of the criminal law. As it is undisputed Mentch did much more than administer, advise, and counsel, the [Medical Marijuana] Program [Act] provides him no defense, and the trial court did not err in failing to instruct on it." (*Mentch*, *supra*, 45 Cal.4th at p. 292, fn. omitted.) As in *Mentch*, defendant went beyond the limited immunized scope of collective or cooperative marijuana cultivation. He entered into two separate written notarized contracts to provide marijuana to the Keeping It Medical for-profit corporation. In return, he would be paid a sufficient amount of money so he would recoup his expenses and live off of the rest of the income. His two separate State Board of Equalization seller's permits, one for a corporation, indicate he expected to earn $60,000 annually. And although not essential, defendant's marijuana growing venture arose in the context of an absence of any caregiver relationship within the Keeping It Medical customer base and community. And, of course, defendant's corporation, Herbmetics, Inc., had no relationship with the K.I.M. Collective other than as a supplier of marijuana.

This case is different from *People v. Urziceanu, supra,* 132 Cal.App.4th at pages 785-786. In *Urziceanu*, the defendant was convicted of conspiracy to sell marijuana. (*Id.* at p. 758.) There was evidence the defendant operated a collective, FloraCare, out of his home. (*Id.* at pp. 759-765.) The jury was not instructed on section 11362.775. The Court of Appeal held that the jury should have been so instructed. (*Id.* at p. 785-786.) The Court of Appeal described the evidence which would serve as a defense to the

21

conspiracy to sell marijuana charge: "Here, at trial, defendant produced substantial evidence that suggests he would fall within the purview of section 11362.775. He presented the court with evidence that he was a qualified patient, that is, he had a qualifying medical condition and a recommendation or approval from a physician. His codefendant Rodger submitted that same evidence as to herself. Defendant further presented evidence of the policies and procedures FloraCare used in providing marijuana for the people who came to him, including the verification of their prescriptions and identities, the fact that these people paid membership fees and reimbursed the defendant for costs incurred in the cultivation through donations. Further, he presented evidence that members volunteered at the cooperative." (*People v. Urziceanu*, *supra*, 132 Cal.App.4th at p. 786.)

In *Urziceanu*, *supra,* 132 Cal.App.4th, the only charge upon which a retrial was ordered was conspiracy to sell marijuana. Section 11362.775 prohibits conviction for cultivation based solely on the fact the accused collectively or cooperatively cultivated marijuana for medical purposes. Conspiracy involves matters such as common design, plan or agreement. (See *People v. Robinson* (1954) 43 Cal.2d 132, 136; see 1 Witkin & Epstein, Cal. Criminal Law 4th ed. 2012) Elements, § 80, p. 375.) The collective action and cooperation elements of section 11362.775 involved a similar type of agreement or conduct covered by the conspiracy to sell marijuana charge in *Urziceanu*. As noted, the present case does not involve a conspiracy charge; merely marijuana cultivation. Here, defendant was not convicted based on collective or cooperative action *by itself*. Section 11362.775 has nothing to do with our case. Hence, there is no merit to defendant's argument his marijuana cultivation conviction must be reversed because his actions were protected from criminal liability by section 11362.775.

[Part III (B) and (C) are deleted from publication.]

22

## B. Unpublished Discussion Concerning The Merits

First, defendant asserts the evidence is insufficient because he was operating under a mistake of fact. The jury was instructed as to mistake of fact. There was substantial deception evidence defendant knew he was not operating within the law including: the deception directed at the City of San Fernando and the State Board of Equalization in connection with the guitar business; the deception directed at the State Board of Equalization in connection with the address of Herbmetics, Inc.; the use of air scrubbers to conceal the smell of marijuana; and the efforts to cover windows at the 1933 First Street premises as described by Officer Cervantes. There was substantial evidence defendant knew his conduct, which Detective Bixler testified would produce large quantities of commercially valuable marijuana, was illegal.

Second, defendant contends section 11362.775 is unconstitutionally vague. We agree with the Attorney General that section 11362.775 is reasonably clear that users and caregivers can associate to cultivate marijuana. It is also clear that such limited collective conduct by itself cannot serve as a basis for criminal liability under state law. (*United States v. Lanier* (1997) 520 U.S. 259, 266; *In re Sheena K.* (2007) 40 Cal.4th 875, 890.)

Third, defendant argues there was instructional error. Defendant argues the trial court incorrectly defined the term "collective" and neglected to instruct on the right to reasonable reimbursement. Given the fact that section 11362.775 was inapplicable, any error was harmless under any standard of reversible error. (*Chapman v. California* (1967) 386 U.S. 18, 22; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Fourth, defendant argues the trial court improperly allowed the parties to argue what the law allows and there was prosecutorial misconduct. Given the state of the evidence any alleged error was harmless under any standard of reversible error. (*Chapman v. California*, *supra*, 386 U.S. at p. 22; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

23

## C. Unpublished Discussion Concerning Fines

First, the trial court stated all mandatory fines associated with this case, without specifying them, are to be imposed. The clerk's minutes fail to fully reflect the imposition of those fines. First, the clerk's minutes refer to the $50 section 11372.5, subdivision (a) laboratory fine but misstates the proper amount of penalties and the surcharge. The order granting probation must be amended to reflect the imposition of the $50 section 11372.5, subdivision (a) laboratory fine plus: a $50 state penalty under Penal Code section 1464, subdivision (a)(1); a $35 county penalty pursuant to Government Code section 76000, subdivision (a)(1); a $10 Penal Code section 1465.7, subdivision (a) state surcharge; a $15 Government Code section 70372, subdivision (a)(1) state court construction penalty; a $10 Government Code section 76000.5, subdivision (a)(1) emergency medical services penalty; a $5 Government Code section 76104.6, subdivision (a)(1) deoxyribonucleic acid penalty; and a $5 Government Code section 76104.7, subdivision (a) state-only deoxyribonucleic acid penalty. (*People v. Sharret* (2011) 191 Cal.App.4th 859, 863-864; *People v. Knightbent* (2010) 186 Cal.App.4th 1105, 1109.)

Second, the clerk's minutes make no reference to another mandatory fine, the section 11372.7, subdivision (a) drug program fee. The clerk's minutes must be corrected to reflect the imposition of the section 11372.7, subdivision (a) drug program fee plus the following penalties and surcharge: a $150 state penalty (Pen. Code, § 1464, subd. (a)(1)); a $105 county penalty (Gov. Code, § 76000, subd. (a)(1)); a $30 state surcharge (Pen. Code, § 1465.7, subd. (a)); a $45 state court construction penalty (Gov. Code, § 70372, subd. (a)(1)); a $15 deoxyribonucleic acid penalty (Gov. Code, § 76104.6, subd. (a)(1)); a $15 state-only deoxyribonucleic acid penalty (Gov. Code, § 76104.7, subd. (a)); and a $30 emergency medical services penalty (Gov. Code, § 76000.5, subd. (a)(1)). (*People v. Corrales* (2013) 213 Cal.App.4th 696, 702.) There is no merit to the suggestion any remand ought to occur to determine defendant's ability to pay the section 11372.7, subdivision (a) drug program fee. The trial court ordered all "mandatory fines" imposed, which includes the drug program fee. Such an order

24

includes an implied finding defendant has the ability to pay it over the three-year probationary period. Defendant imposed no objection to the broad order concerning mandatory fines nor asserted an inability to pay it. Because of the discretionary nature of the ability to pay the assessment, the failure to object forfeits any issue in that regard. (*People v. Tillman* (2000) 22 Cal.4th 300, 303; *People v. Scott* (1994) 9 Cal.4th 331, 353, fn. 15.)

Finally, the trial court orally imposed a $500 fine plus penalty assessments. Penal Code section 672 states in part: "Upon a conviction for any crime punishable by imprisonment in any jail or prison, in relation to which no fine is herein prescribed, the court may impose a fine on the offender not exceeding . . . ten thousand dollars ($10,000) in cases of felonies . . . ." Here there are mandatory fines which were imposed pursuant to sections 11372.5, subdivision (a) and 11372.7, subdivision (a). Thus, no fine could be imposed pursuant Penal Code section 672. (*People v. Breazell* (2002) 104 Cal.App.4th 298, 302; see 3 Witkin & Epstein, *op. cit.*, Punishment, § 102, p. 180.) The order imposing a $500 fine plus penalty assessments is reversed.

[The balance of the opinion is to be published.]

## IV. DISPOSTION

The judgment of conviction is affirmed. The orders granting probation and imposing fines are modified as specified in part III (C) of this opinion. Upon remittitur issuance, the judgment and the clerk's minutes are to be modified to conform to part III (C) of this opinion.

**<u>CERTIFIED FOR PARTIAL PUBLICATION</u>**

TURNER, P. J.

We concur:

MOSK, J.

KRIEGLER, J.